## UNITED STATES of America, Plaintiff–Appellee,

v.

## Andrew Jackson SMITH, Isaac Hicks, Samuel Smith, James Sawyer, Defendants–Appellants.

No. 88–5187.

United States Court of Appeals, Eleventh Circuit.

Dec. 14, 1990.

---

**1504**

Arthur Joel Berger, Miami, Fla., for A.J. Smith.

Dexter W. Lehtinen, U.S. Atty., Lee S. Massey, Linda Collins–Hertz, Anne M. Hayes, Asst. U.S. Attys., Miami, Fla., for U.S.

John Lipinski, Miami, Fla. (court appointed), for S. Smith.

Lee Weissenborn (court appointed), Sheridan Weissenborn, Miami, Fla., for James Sawyer.

William R. Tunkey (court appointed), Miami, Fla., for Isaac Hicks.

Before KRAVITCH and ANDERSON, Circuit Judges, and GODBOLD, Senior Circuit Judge.

GODBOLD, Senior Circuit Judge:

Defendants Isaac Hicks, James Sawyer, A.J. Smith, and Samuel Smith appeal from their convictions and sentences following a five-week narcotics conspiracy trial.[1] We affirm on all issues with a single exception. Defendants Hicks and A.J. Smith were improperly convicted of multiple firearm offenses; we vacate their sentences on these convictions and remand to the district court with instructions.

The major issues involve validity and execution of search warrants (Hicks), severance (Samuel Smith and Sawyer), evidentiary issues (Sawyer), jury instructions (Samuel Smith), excusal of a juror and substitution of an alternate (Hicks, Samuel Smith and A.J. Smith), sufficiency of the evidence (Sawyer and Samuel Smith), sentencing issues (A.J. Smith and Samuel Smith), and validity of multiple firearms convictions (Hicks and A.J. Smith).

I.

During an 18–month investigation beginning in October 1985 federal and local government investigators obtained and executed some 20 warrants to search various residences used by the defendants in Miami, Florida. During these searches investigators seized narcotics, firearms, cash and jewelry, as well as documentary evidence that included several ledgers.

During the first three months of the investigation the agents focused on three residences: 1935–A N.W. 95th Terrace (located near a public high school) where Sawyer resided, 2170 N.W. 91st Street where A.J. Smith resided, and 2000 N.W. 105th Street where Isaac Hicks and Janet Hicks resided. During this period confidential informants made three or four purchases of cocaine from Sawyer at both the 95th Terrace and the 91st Street residences. Undercover agents observed unusually high traffic flows at all three of these locations (for example, up to 300 separate cars and trucks during one three-hour period on a Friday or Saturday evening). Agents saw Sawyer and A.J. Smith frequently entering and leaving the 2000 N.W. 105th Street residence and otherwise interacting with Hicks.

On January 7, 1986 law enforcement agents obtained and executed warrants to search the 95th Terrace (Sawyer) and the

---

1. Four other defendants were named in the indictment. Randolph Williams and Kenneth Ivery were fugitives at the time of trial. Defendants Janet Hicks and Harold McLeod were tried and convicted with the four other appellants. Janet Hicks died after filing a notice of appeal. McLeod filed a notice of appeal but did not file a brief.

91st Street (A.J. Smith) residences. A.J. Smith was outside his residence when the agents conducted their search. They discovered cocaine, packaging materials, including manila envelopes labeled in red, cash, and mail addressed to Smith and to Isaac Hicks. They also found a rifle, a crossbow and a hand grenade in the house, as well as several handguns in Smith's car.

At Sawyer's residence agents discovered two handguns and a large quantity of cash. Sawyer was carrying $2,000 in cash on his person on the day of the search. At 95th Terrace investigators found several ledgers containing listings of quantities of narcotics and of money values, and references to Sawyer, A.J. Smith, Hicks, and others involved in the alleged conspiracy. The ledger's author or authors used a system of color codes and coded notations in recording information. Different colors corresponded to different quantities of narcotics.

Later that month, after another undercover purchase at A.J. Smith's residence, agents again executed search warrants at the 95th Terrace and 91st Street residences. A.J. Smith and Sawyer were together at Smith's residence when the agents arrived. In this residence they discovered cocaine and photographs of Smith brandishing firearms and money. In both residences investigators found loose papers similar to the entries in the ledgers seized from Sawyer's residence earlier in the month.

After these searches activity at these residences subsided. With the aid of a confidential informant investigators arranged purchases of cocaine at other locations identified by Sawyer and surveilled other locations through July 1986. In late June agents again searched Sawyer's residence and seized narcotics, packaging materials, cash, ledgers, and a handgun. On July 25, 1986, after an undercover purchase of a half-ounce of cocaine at Hicks's residence, law enforcement agents obtained and executed a search warrant for that residence, 2000 N.W. 105th Street. Hicks, Sawyer, and others were present during the search. The agents seized automatic weapons and cash in the house. In the carport they discovered cocaine under Hicks's car. Agents also seized a business card from Hicks's person, the back of which contained the same kind of color and numerical codes used in the ledgers seized at Sawyer and A.J. Smith's residences.

In the following months the investigation spread to yet more residences. Agents continued the pattern of executing search warrants and seizing narcotics and firearms. By October 1986 Sawyer had apparently moved from the residence on 95th Terrace to a house at 2137 N.W. 92nd Street. Investigators executed a search warrant at this residence in late October and seized marijuana, packaging materials, an adding machine, ledgers, photographs of Sawyer, Hicks and A.J. Smith, cash, and firearms.

Investigators became aware of defendant Samuel Smith's role in the conspiracy in late 1986, through the aid of his cousin, informant Alice Rolle. Samuel Smith told Rolle that he worked for Hicks selling drugs. On several occasions Rolle purchased narcotics from Samuel Smith, who had in turn obtained the drugs from Hicks. Rolle also observed Hicks pay his "employees" with cocaine at his residence. In February 1987 Rolle attempted to purchase cocaine directly from Hicks at his residence but was informed that she would have to speak to Samuel Smith. Samuel Smith later arrived at Hicks's residence and reprimanded Rolle for not dealing through him. He told Rolle, "[I]f I buy something from him and get busted, I suppose to die." A couple days after this episode Samuel Smith visited Rolle early in the morning and told her that he had heard she was an informer and that only his influence had saved her life.

In February 1987 Debra Plez became an informant for the law enforcement team. Plez was a social acquaintance of Hicks and had previously purchased cocaine from him. Twice in March and April 1987 Plez purchased cocaine from Hicks in transactions monitored and recorded by law enforcement agents. Plez also asked if she could buy a kilogram or half a kilogram of

cocaine from Hicks; Hicks told her to let him know when she was ready.

Events in late April 1987 marked the crescendo and the end of the investigation. In conversations on April 14 and 23 A.J. Smith informed Plez that he and Hicks expected to receive a shipment of 40 kilograms of cocaine at Dodge Island on April 24. On the evening of the 24th Plez was present at Hicks's residence on 105th Street, along with Hicks, Sawyer and A.J. Smith. Plez observed a briefcase in the open trunk of Hicks's car that contained, according to A.J. Smith, $250,000. At this point Plez left the house, walked to a gas station and called Detective Dennis Reddington.[2] Hicks, Sawyer and another departed the residence in a van and returned a few hours later. Hicks walked out of the van carrying a package that appeared to contain a white substance. Plez then overheard Hicks comment to A.J. Smith: "This stuff here better be like the other, because this is righteous."

A.J. Smith then invited Plez to join him and another person as he drove the van to another of Hicks's residences, 9800 N.W. 25th Avenue. Smith backed the van up to the garage at this residence, and he and the other person unloaded boxes from the van. Two of these boxes were open; they appeared to Plez to contain small packages of cocaine. After unloading the van Smith and the others returned to 2000 N.W. 105th Street.

Three days later, on April 27, Plez contacted Detective Reddington. Based on the information she provided, Reddington obtained a warrant to search the residence at 9800 N.W. 25th Avenue. Meanwhile, agents surveilling this house observed Hicks's car arrive and depart about a half hour later. After a high-speed chase they stopped Hicks and Sawyer in the car. Reddington arrived at the scene of the stop and obtained a garage door opener from Hicks's car. The agents then placed Hicks and Sawyer in a police car and transported them to 9800 N.W. 25th Avenue. Redding-

ton and other agents entered the garage using the opener, knocked on the door and announced their presence, and executed the search warrant.

This search proved to be the payoff. It revealed over 11 kilograms of cocaine in various stages of preparation and packaging, cocaine processing equipment and literature, packaging materials marked with color coding, and ledgers containing codes of the same sort discovered in earlier searches in the investigation. The agents also found over $33,000 in cash in the house, jewelry valued by the government at over $400,000, three handguns, and a sawed-off rifle. They also found mail addressed to Samuel Smith at 2000 N.W. 105th Street. Hicks, Sawyer, and others were arrested at the scene.

The grand jury returned an indictment charging these defendants with the following offenses:

ISAAC HICKS: one count of engaging in a continuing criminal enterprise (CCE) (21 U.S.C. § 848); one count of conspiracy to possess with intent to distribute at least five kilograms of cocaine (21 U.S.C. § 846); two counts of distribution of cocaine within 1,000 feet of a public secondary school (21 U.S.C. §§ 841(a)(1), 845a, 18 U.S.C. § 2); five counts of possession with intent to distribute cocaine (§ 841(a)(1), 18 U.S.C. § 2); one count of possession of a firearm by a convicted felon (18 U.S.C.App. II, § 1202(a)(1)); and four counts of possession of firearms by a convicted felon (18 U.S.C. § 922(g)(1)).

JAMES SAWYER: one CCE count; one count of conspiracy to possess with intent to distribute at least five kilograms of cocaine; two counts of distribution of cocaine within 1,000 feet of a public secondary school; three counts of possession of a firearm by a convicted felon; two counts of possession with intent to distribute cocaine; and one count of possession with intent to

---

2. Plez did not actually speak with Reddington but instead used the telephone to transmit information through coded electronic signals.

distribute marijuana (§ 841(a)(1), 18 U.S.C. § 2).

A.J. SMITH: one count of conspiracy to possess with intent to distribute at least five kilograms of cocaine; four counts of possession of a firearm by a convicted felon; and two counts of possession with intent to distribute cocaine.

SAMUEL SMITH: one count of conspiracy to possess with intent to distribute at least five kilograms of cocaine; and one count of distribution of (an unspecified quantity of) cocaine.

## II. WARRANT ISSUES

Hicks raises these issues concerning warrants:

For the search at 9800 N.W. 25th Avenue on April 27, 1987:

—Denial of motion to suppress physical evidence seized.

—Partial denial of a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

For the search at 2000 N.W. 105th Street on July 25, 1987:

—Denial of motion to suppress physical evidence seized.

—Denial of motion for a *Franks* hearing.

At the end of a November 2, 1987 hearing the court identified three unresolved motions: both of the motions concerning 9800 N.W. 25th Avenue and, as to 2000 N.W. 105th Street, the motion to suppress physical evidence. The next morning, and continuing on to the morning of November 4, the court conducted an evidentiary hearing on the motions concerning 9800 N.W. 25th. It granted the request for a *Franks* hearing to the extent of examination of the affiant agent concerning his statement that he considered the confidential informant reliable and denied the motion to examine the confidential informant concerning her credibility. After the parties rested the court began an evidentiary hearing on the motion to suppress evidence seized at 2000 N.W. 105th Street. At that point Hicks attempted to raise a *Franks* challenge to the veracity of the affidavit supporting the warrant. The district court granted the government's objection on the basis that the motion was untimely. Later it reaffirmed that ruling but also denied the motion on the merits.

■ As to the motion to suppress evidence seized at 9800 N.W. 25th Avenue: the court did not err in finding that there was adequate probable cause. Hicks's major contention on this issue is that the reliability of the confidential informant, on whose information the affidavit was based, was insufficiently established by the affiant's conclusory statement that she was a reliable, confidential informant who had provided information in the past that had proved to be reliable. The information set out as supplied by the informant was complete, specific and detailed information, the type we have referred to as "self-corroborating." *U.S. v. Haimowitz*, 706 F.2d 1549 (11th Cir.1983), *cert. denied*, 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984). The information described names, dates, addresses, specific events occurring at 2000 N.W. 105th Street, the actors in those events, amounts of money, packaging of money, packaging of cocaine, automobiles utilized and their movements, and a host of other specific information. Hicks was described as a major actor who slept at the house and used it as a personal stash house; this was corroborated by the affiant's own knowledge, included in the affidavit, that searches of residences owned by Hicks had revealed drugs, drug ledgers, documents, jewelry, currency and other evidence of narcotics trafficking. The magistrate did not err in finding probable cause.

■ There is no merit to the contention that once alleged false statements are redacted from the affidavit probable cause is lacking, and to the argument that, even if the warrant was otherwise sufficient, there was no probable cause to search for documents. The warrant was not overbroad. The property described as located at 9800 N.W. 25th Street was "cocaine, documents, letters, photographs, business records, and other evidence relating to narcotics trafficking." Reasonably read, this language is directed to materials having a nexus to

**1508**

narcotics trafficking. We hold that this language meets the standards of practical accuracy that enable the searcher to ascertain and identify things authorized to be seized. The contention that the affidavit provided no reasonable basis to search for documents, letters, photos and business records is frivolous. The affidavit placed Hicks at the premises with $250,000 to be used to buy cocaine, and returning three hours later with white powder that appeared to be cocaine. Hicks referred to it in obscene terms often applied to cocaine. The affidavit described the premises as a protected stash house used by Hicks to secure valuable personal property such as jewelry, documents and cash and stated that Hicks sleeps at the residence. The residence was owned by Hicks's nephew, and previous searches of residences owned by Hicks himself had revealed drugs, drug ledgers, documents, jewelry, currency, and other evidence of narcotics trafficking.

■ In execution of the warrant there was not an impermissible seizure of jewelry belonging to Hicks. The jewelry (stated by the government to be valued at over $400,000) was located in a house cluttered with cocaine, packaging materials, processing paraphernalia, ledgers, large amounts of cash, weapons, and ammunition. It is disingenuous to suggest that in these circumstances the jewelry was not evidence of narcotics trafficking.

■ As to the motion for a *Franks* hearing concerning 9800 N.W. 25th Avenue: the court granted a hearing with respect to examination of the affiant agent. It denied a hearing to examine the confidential informant as to her reliability, relying on the Supreme Court's limiting language in *Franks* itself: "The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any non-governmental informant." 438 U.S. at 171, 98 S.Ct. at 2684. The court ruled that Hicks had not supported by affidavit his conclusory allegation that Plez was an agent of the government, his affidavit having addressed the accuracy of Plez's statements and not her role. The following day, November 3, while motion to suppress hearing was in progress, Hicks asked for reconsideration by a motion that did not contain affidavits but referred to alleged record evidence. The court denied the request.

Plez was not an agent or instrumentality of the government within the meaning of *Franks*. Hicks's contention would open up to *Franks* hearings the whole world of the compensated, non-official civilian informant. *Franks* opened government agents to examination on proper showing but shielded informants. The decision nowhere implies that compensated civilian informants are to be open to examination by titling them government agents, and we decline to so extend it.

■ As to the motion to suppress evidence seized at 2000 N.W. 105th Street: the warrant authorized search of premises consisting of a house, garage, another building within the curtilage, and a screened swimming pool, all surrounded by a wall. The affidavit described a scenario in which the two affiant officers set up a buy by a confidential informant to take place at the premises. They observed the informant enter the premises, enter the garage area and then the swimming pool area and converse with persons in that area. The informant emerged some minutes later, delivered to the affiants cocaine and change from the government-supplied money, and stated that the cocaine was purchased and delivered at the screened patio area (which the parties construe in their briefs to mean the swimming pool area). Hicks and his wife are owners and residents of the premises. Hicks contends probable cause is lacking because the affidavit does not identify him or his wife as the seller or even as present, the cocaine sold was a small amount that could have been concealed on the person of a third-party seller merely present, and the transaction at the pool does not support searching the adjacent house. The sale took place at the premises. The warrant authorized search of the premises for cocaine, titles, receipts and other documents and records evidencing illegal activity. The finding of probable cause was not error. The war-

rant was not overbroad. The seizure of currency was authorized. The firearms were not improperly seized, though not named in the warrant. They are "tools of the trade". *U.S. v. Montes-Cardenas*, 746 F.2d 771, 776–77 (11th Cir.1984); *U.S. v. Rodriquez*, 765 F.2d 1546, 1562 (11th Cir. 1985); *U.S. v. $41,305 in Currency*, 802 F.2d 1339, 1342 (11th Cir.1986). The firearms were found in sleeping areas where officers had a right to be pursuant to a valid warrant and they were plainly visible. There was probable cause to believe the items were evidence or contraband. *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987).

■ With respect to Hicks's attempt to raise a *Franks* challenge to the 2000 N.W. 105th Street warrant: the court had ordered that all pretrial motions be filed by August 25. This motion surfaced when, on November 4, hearing was beginning on Hick's motion (filed August 25) to suppress evidence under the warrant. The court denied the *Franks* request as untimely. Later the court reaffirmed this ruling and also denied the motion on its merits. The court did not err on either ground.

■ The district court has the authority to establish a schedule of deadlines for defendants to file motions and requests prior to trial under Rule 12(c) of the Federal Rules of Criminal Procedure. By failing to file his motion within the deadlines set by the court a defendant waives his right to assert this motion. Fed.R.Crim.P. 12(f). The court may grant relief from such a waiver upon a showing of cause. *Id. See generally U.S. v. Milian-Rodriguez*, 828 F.2d 679 (11th Cir.1987), *cert. denied*, 486 U.S. 1054, 108 S.Ct. 2820, 100 L.Ed.2d 921 (1988). We review a denial of the motion on grounds of untimeliness under an abuse of discretion standard. *U.S. v. Taylor*, 792 F.2d 1019, 1025 (11th Cir.1986), *cert. denied*, 481 U.S. 1030, 107 S.Ct. 1958, 95 L.Ed.2d 530 (1987).

Hicks's timely motion to suppress did not expressly make a *Franks* request, and his argument that it impliedly made such a request has no merit. (With respect to evidence seized at 9800 N.W. 25th Street,

Hicks had filed a motion to suppress and a separate motion for a *Franks* hearing.) Hicks had an opportunity as late as November 2 and 3 to notify the court and the government of his request for a *Franks* examination but did not do so. Beyond arguing that his request was subsumed in the motion to suppress, Hicks has not attempted to establish cause for untimeliness. The district court did not abuse its discretion by denying Hicks's request as untimely. We need not address the denial on the merits beyond saying that the court's denial was not erroneous.

## III. TRIAL ISSUES

In this section, we discuss claims of error arising during or in relation to the trial.

### A. MOTIONS FOR SEVERANCE

The principles governing our review of denial of severance are familiar.

> To determine whether the district court abused its discretion in refusing to sever, the interest of judicial economy and a policy favoring joint trials in conspiracy cases must be weighed against [the defendant's] allegations of prejudice. Some degree of prejudice is inherent in every joint trial, but only in the event such prejudice appears to be compelling does severance become warranted. To assess the presence of compelling prejudice, we look to all the circumstances of the particular case to determine whether the court's instructions sufficiently enabled the jurors to keep separate the evidence as relevant to each defendant.

*U.S. v. Harris*, 908 F.2d 728, at 736–37 (11th Cir.1990) (citations and quotations omitted).

#### 1. *Samuel Smith*

■ Samuel Smith contends he was entitled to severance because the evidence showed him to be only a minor actor; the great majority of the evidence offered at trial bore on counts against the others, and he suffered prejudice as a result of spillover from the mass of evidence against them. He was tried on only two counts,

but one of these was the conspiracy count that named all defendants in the case. The government's evidence against Samuel Smith consisted for the most part of a single witness, Alice Rolle, who provided evidence of both Smith's guilt and the guilt of other defendants.

 A defendant does not suffer compelling prejudice, sufficient to mandate a severance, simply because much of the evidence at trial is applicable only to co-defendants. *E.g., U.S. v. Pritchett,* 908 F.2d 816, at 822 (11th Cir.1990). The possible prejudicial effects of such disparity can be significantly alleviated if the trial judge is careful to instruct the jury that it must consider the evidence against each defendant on a separate and independent basis. *Id.* The trial judge so instructed the jury in this case on multiple occasions. Denial of Samuel Smith's motion for severance was not an abuse of discretion.

### 2. *James Sawyer*

 The court did not err in denying Sawyer's motion for severance, which urged prejudicial jury confusion between the evidence bearing on his CCE charge and evidence bearing on the CCE charge against co-defendant Hicks. Sawyer asserts that the jury may have been led to believe that it had to find an independent entity, similar to the "enterprise" concept used in the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*, as an element of the CCE charge against Sawyer; i.e., the jury may thus have believed that defendant Hicks's narcotics "organization" served to establish this perceived element of Sawyer's CCE offense, even though the correct question was whether Sawyer independently committed a series of federal felony violations. *See infra* section III(F)(1) of this opinion (setting out elements of CCE offense). This argument is speculative. The district court correctly charged the jury as to the elements of the offense, and on several occasions charged on the importance of considering the evidence against each defendant separately and independently. The evidence was not of such a character that

the jury could not have performed this necessary function.

### B. ADMISSION INTO EVIDENCE OF LEDGERS

Sawyer asserts that the ledgers seized during the government's various searches and admitted over his objection constitute hearsay, were not properly authenticated, and that none of their authors was identified.

 We review on an abuse of discretion standard. *U.S. v. Metallo,* 908 F.2d 795, at 798–799 (11th Cir.1990). Rule 901 of the Federal Rules of Evidence requires authentication or identification of a document as a condition precedent to its admissibility. Fed.R.Evid. 901(a). The government may authenticate a document solely through the use of circumstantial evidence, including the document's own distinctive characteristics and the circumstances surrounding its discovery. Fed.R. Evid. 901(b)(4); *U.S. v. Elkins,* 885 F.2d 775, 785 (11th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990). The ledgers here include references to Sawyer and to co-defendants. They are composed of special color and notation codes, similar to those found on containers of narcotics during searches and on business cards seized from Hicks's person. They were seized from residences owned or used by Sawyer and by the other defendants in the case. These circumstances confirm that the author or authors of the ledgers were intimately involved in the operation of the narcotics conspiracy at issue in the case. This is sufficient for purposes of Rule 901; the specific identity of the author is not necessary. *See U.S. v. Reyes,* 798 F.2d 380, 383 (10th Cir.1986); *U.S. v. Helmel,* 769 F.2d 1306, 1312 (8th Cir.1985); *U.S. v. Drougas,* 748 F.2d 8, 26 (1st Cir. 1984); *U.S. v. De Gudino,* 722 F.2d 1351, 1355 (7th Cir.1983).

 The government demonstrated by sufficient evidence that the ledgers were statements made by Sawyer's co-conspirators during the course and in furtherance of the conspiracy and thus were not hearsay under the federal rules. Fed.R.Evid.

801(d)(2)(E). The evidence of record at the time Sawyer made his objection, in addition to the ledgers themselves, sufficed to prove by a preponderance that such a conspiracy existed, that Sawyer was a member of it, and that the ledger entries were made during it and in furtherance of it. *See Bourjaily v. U.S.*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987). The district court did not abuse its discretion in admitting them. *Accord Helmel*, 769 F.2d at 1312–13; *De Gudino*, 722 F.2d at 1356.

## C. REFERENCES TO SAWYER AS "BOSS MAN"

▆ Sawyer objects to repeated references to him as "Boss" and "Boss Man" by witnesses and in argument by the government. He claims undue prejudice, especially with regard to the CCE count and its element that he supervised, organized, or managed at least five people. The government's evidence established that Sawyer was known within the society of this conspiracy by these names. There was no error in the revelation of this fact nor in references to him by witnesses who knew him only by these monikers. *See U.S. v. Hattaway*, 740 F.2d 1419, 1425 (7th Cir.), *cert. denied*, 469 U.S. 1028, 105 S.Ct. 448, 83 L.Ed.2d 373 (1984). As we discuss later in this opinion, the nicknames were relevant to the CCE charge. The references in argument to the jury lie within the realm of reasonable argument.

## D. FAILURE TO GIVE REQUESTED INSTRUCTION ON THEORY OF DEFENSE

There was no abuse of discretion in the court's denial of Samuel Smith's requested jury instruction on theory of defense. The matter was adequately covered elsewhere in the instructions.

## E. SUBSTITUTION OF ALTERNATE FOR JUROR

▆ All parties rested at 5:30 p.m. on Monday, December 14, 1987. The district judge scheduled the charge conference for the following morning and excused the jurors until Wednesday morning, December 16. Throughout Wednesday the jury heard closing arguments. At the end of the day the judge instructed the jurors to return to the courtroom the next morning, at which point he would instruct them and they could begin their deliberation. On Thursday morning, before the jury entered the courtroom, a juror sent the judge a note which read:

> Your Honor: According to you, last week you said that we were going to finish at the beginning of the week, early in the week. I changed my plane reservation for today because I thought Wednesday was going to be our last day. Now, if I don't leave today, I won't have reservations to leave to Santo Domingo. My family is gone, and they are waiting for me. Please tell me if we are finishing today.

Record, Vol. 32 at 3676. The judge called the juror into court to discuss the matter, along with counsel for the government and the defense. The juror informed the court that she had reservations to leave at 5:30 that afternoon to join her family in Santo Domingo for the Christmas holiday. The juror expressed concern that if she did not leave on this flight she would be unable to arrange another flight during the holiday season. The judge explained to the juror that he could not assure her that the jury would finish deliberating by any particular time and asked her if she could continue as a juror. The juror responded, "No problem" and then added, "Well, no problem, I guess." At a sidebar conference one of the counsel for the defendants noted that the juror was obviously very upset, judging from her tone of voice and her facial expression.

The judge returned the juror to the jury room and declared a brief recess during which a defense counsel attempted to arrange alternative flight arrangements for the juror through his travel agency. In the meanwhile the juror informed the court through the marshal that her travel agent had told her that her flight was scheduled to leave at 12:15 p.m. that day, rather than 5:30 p.m. The judge stated:

Well, that makes it even worse. I think we're going to have to be realistic and recognize that we have an unhappy juror there who has plans that have already been made in advance, that to change those plans from the nature and demeanor that she exhibited here in court can very likely affect everybody in the case, not just the Government but all the defendants as well. I think we ought to face up to it and excuse her and put the first alternate in her place.

The government moved to excuse the juror, and counsel for one of the defendants objected, arguing that the juror should be given the choice of deliberating or not. The court then announced its decision:

[Defense counsel,] we still come back to the same thing. Assuming you get her a reservation for Saturday or Friday, that still may not answer the problem if the jury hasn't completed its deliberations. We would then be faced with quite a problem of whether are we going to keep a really disgruntled juror on that jury, and we certainly can't substitute someone from amongst the alternates at that point in time. It's almost impossible to instruct the jury to go back to square one all over again with one of the alternates in there.

I regretfully am going to grant the Government's motion. I'm going to substitute the first alternate. I think that the entire fate of the trial could hang in balance, and it would affect inequitably the Government as well as all the defendants. It just doesn't cut one way. It cuts all the way around here, so that's what I'm going to do.

After excusing this juror the judge then denied defendants' motions for a mistrial, brought the jury into court, designated the first alternate as a regular juror, and charged the jury.

■■■■■ Defendants Hicks, Samuel Smith and A.J. Smith contend that the district court's decision was reversible error. When facts arise before the start of deliberations that cast doubt on a juror's ability to perform her duties, the district court bears discretion to excuse the juror and replace her with an alternate. Fed.R. Crim.P. 24(c); *U.S. v. Fajardo,* 787 F.2d 1523, 1525 (11th Cir.1986); *U.S. v. Sobamowo,* 892 F.2d 90, 95 (D.C.Cir.1989), *cert. denied, Adair v. U.S.,* —— U.S. ——, 111 S.Ct. 78, 112 L.Ed.2d 51, and *Toomer v. U.S.,* —— U.S. ——, 111 S.Ct. 78, 112 L.Ed.2d 51 (1990). We review the exercise of this discretion to ensure that the district court did not discharge the juror "without factual support, or for a legally irrelevant reason." *Fajardo,* 787 F.2d at 1525 (quoting *U.S. v. Rodriguez,* 573 F.2d 330, 332 (5th Cir.1978)). In this case the district court acted within its discretion in excusing the juror because of its concern over the potential disruptive effect she could have on the jury during deliberations. "The decision to excuse a juror who may disrupt deliberations also is entrusted to the sound discretion of the trial court." *Id.* at 1526. The district judge personally examined the juror and was in a superior position to determine her state of mind and ability to comport herself. He was convinced that she would be unable to deliberate effectively because of her concern over spending Christmas vacation with her family. It is significant that the district judge also found that her distraction would disrupt the efforts of the jury as a whole to evaluate the evidence and reach a verdict. *See id.* ("the degree of disruption is gauged better by first-hand impressions rather than the review of a cold record"). The record reflects that the juror was evidently upset, and the district judge made his decision only after discussing the matter with her and with counsel for government and the defendants. There is no evidence of bias toward any party on the part of the judge. There was no abuse of discretion. *Cf. U.S. v. Shelton,* 669 F.2d 446, 460 (7th Cir.) (no abuse of discretion to excuse impatient and disgruntled juror because of concerns of disruptive effect on other jurors in long trial), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982) (cited in *Fajardo,* 787 F.2d at 1526); *U.S. v. Brown,* 571 F.2d 980, 984–85 (6th Cir.1978) (no abuse of discretion to excuse juror who was upset and anxious over marital relations); *U.S. v. Hoffa,* 367 F.2d 698, 712 (7th

Cir.1966) (no abuse of discretion to excuse juror whose mother had become seriously ill), *vacated on other grounds,* 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967).

### F. SUFFICIENCY OF THE EVIDENCE

On December 21 the jury found each defendant in this appeal guilty of each offense with which charged. The court set sentencing dates and ordered presentence investigation reports for all defendants. By written orders, on February 11, 1988, the court set aside the conspiracy convictions of Hicks and Sawyer after the government agreed that these charges were lesser included offenses of the continuing criminal enterprise convictions.[3]

▮ In considering whether the evidence supported the verdict we construe the evidence in the light most favorable to the government and ask whether a reasonable trier of fact could find guilt on the basis of it beyond a reasonable doubt. The evidence need not preclude every reasonable hypothesis of innocence; a jury is free to choose among reasonable constructions of the evidence. *U.S. v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

#### 1. *Sawyer's CCE Conviction*

To prove that [Sawyer] engaged in a continuing criminal enterprise, the government had to prove that (1) [he] committed a felony violation of the Federal law, (2) which was part of a continuing series of such violations, (3) which were undertaken in concert with five or more persons, (4) with respect to whom [he] occupied a position of organizer or supervisor or any other position of management, and (5) from which he derived substantial income or resources.

*U.S. v. Harris,* 908 F.2d 728, 735 (11th Cir.1990) (citing *U.S. v. Boldin,* 818 F.2d 771, 774 (11th Cir.1987)). Sawyer's motion for judgment of acquittal was denied. On appeal he asserts that the government failed to prove beyond reasonable doubt elements (3), (4) and (5).

There was testimony from a confidential informant that Sawyer was a "lieutenant" in Hicks's organization who supervised cocaine salesmen and dropped off and picked up money. Testimony established that Sawyer's nickname or street name was "Boss" or "Boss Man" and that he referred to himself by these names. Ledgers were found in his residence (and other residences) relating to operations and personnel of the Hicks organization. The ledgers contained the names of numerous persons (more than 10) associated with the organization. Some ledgers contained notes that can be interpreted as relating to power or supervision by Sawyer: "Dear Boss, I want to get my hair done. Angie"; "Man, I am not in power like Boss." Other notations state "Approved by Boss (or Boss Man)," which evidences a managerial or supervisory role. The only other person whose name appeared in that context was Hicks.

▮ The evidence was sufficient to submit element (4) to the jury. Identification of the individuals is unnecessary. *U.S. v. Raffone,* 693 F.2d 1343, 1348 (11th Cir. 1982). The subordinates need not have acted in concert with one another. There can exist separate individual relations between defendant and the subordinates. *U.S. v. Boldin,* 818 F.2d 771, 775 (11th Cir.1987). The defendant need not be a sole leader or a kingpin, only a supervisor or manager. *Id.* at 776.

▮ The government may establish the element of derivation of substantial income or resources by circumstantial evidence. *U.S. v. Draine,* 811 F.2d 1419, 1421 (11th Cir.) (per curiam), *cert. denied,* 484 U.S. 827, 108 S.Ct. 94, 98 L.Ed.2d 55 (1987); *U.S. v. Phillips,* 664 F.2d 971, 1035 (5th Cir. Unit B 1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). The record contains ample evidence that large amounts of cocaine and tens of thousands of dollars passed through the

---

**3.** *See U.S. v. Harris,* 908 F.2d 728, at 736–737 (11th Cir.1990) (citing *U.S. v. Michel,* 588 F.2d 986, 1001 (5th Cir.), *cert. denied,* 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979)).

operation in which Sawyer was an integral player. *See U.S. v. Graziano,* 710 F.2d 691, 698 (11th Cir.1983) (narcotics may constitute "resource" for purposes of this element of § 848 offense), *cert. denied,* 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984). The jury may reasonably conclude that the supervisors and managers of such a lucrative operation derived income from it. *See Draine,* 811 F.2d at 1421; *U.S. v. Bolts,* 558 F.2d 316, 321 (5th Cir.), *cert. denied,* 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977). In addition, investigators discovered sizable amounts of cash and expensive jewelry in Sawyer's possession (and cash in houses where he lived) though he claimed to be employed at $250 per week. He was seen sitting on the floor counting a 10 to 12 inch deep pile of currency and was observed handing large bundles of currency to his brother through a car window. At one point he complained to police, who conducted a remarkable number of raids and searches, "Why do you keep coming in here and taking my money." Although he attempted to offer plausible, legitimate explanations, the jury was free to conclude that assets he held represented income derived from his criminal offenses and to infer that some of the large amounts of money he handled either was or became his.

There was no error in denial of the motion for judgment of acquittal.

### 2. *Samuel Smith's Conspiracy Conviction*

■ Samuel Smith challenges the sufficiency of the evidence as to his conviction for conspiracy to possess with intent to distribute at least five kilograms of cocaine. 21 U.S.C. § 846. Construing the testimony of witness Rolle, described earlier, most favorably to the government, the evidence showed that Samuel Smith was intimately familiar with the general purpose of the cocaine distribution conspiracy and that he participated in it, and furthered it, by selling cocaine for Hicks. On the basis of this evidence the jury could reasonably reject Samuel Smith's argument that he knew nothing of the conspiracy and was only a mere "buyer" of cocaine from the other defendants.

## IV. SENTENCING ISSUES

After presentence reports were completed for each defendant, the district court conducted a sentencing hearing. The court imposed the following aggregate sentences:

Hicks: 137 years imprisonment, six years special parole, and a supervised release period of five years;

Sawyer: 56 years imprisonment, six years special parole, and a supervised release period of five years;

A.J. Smith: 28 years imprisonment, six years special parole;

Samuel Smith: 20 years imprisonment on each of the two counts of conviction, to run concurrently, and a committed fine of $8,000.

### A. REFERENCE IN PRESENTENCE REPORT TO A.J. SMITH AS AN "ENFORCER"

■ At the sentencing hearing A.J. Smith objected to the description in the presentence report of him as an "enforcer" for the underlying conspiratorial organization who bore the responsibility of "motivating payment" of debts for narcotics. The government, relying upon evidence at trial, pointed out that several weapons had been seized from his car and from a house at which he had been residing, as had photographs showing Smith brandishing firearms. He had weapons at his house and in his car throughout the period charged in the indictment. In addition, Smith had told undercover agents that someone had stolen a kilogram of his cocaine, that he intended to seek revenge, and that he had the firepower to do so. The district court overruled Smith's objection to this aspect of the presentence report.

"As with all factual findings under the guidelines, this determination is entitled to deference and can be reversed only if it is clearly erroneous." *U.S. v. Rowland,* 906 F.2d 621, 623 (11th Cir.1990) (citations omitted). The specific physical evidence mentioned above, the evidence that the defen-

dant was willing to use firearms aggressively in pursuit of his goals, and the evidence adduced at trial regarding A.J. Smith's participation in this conspiracy suffice to show that the district court was not clearly erroneous in finding Smith was an enforcer for the organization.

### B. QUANTITY OF NARCOTICS AS REGARDS SAMUEL SMITH'S SENTENCE

■■■ Samuel Smith urges that his sentence to two concurrent 20-year terms is improper, because it is predicated on a finding that he possessed, and conspired to possess, more than five kilograms of cocaine with the intent to distribute it. His argument as to the term of imprisonment resulting from the conspiracy conviction is premised on his contentions that that conviction was based on insufficient evidence. In preceding sections we have affirmed that conviction. The implicit finding that the conspiracy involved the possession of more than five kilograms of cocaine is amply supported by the record, and the sentence on that count is not improper. *See U.S. v. Roberts*, 881 F.2d 95, 104–05 (4th Cir.1989).

The superseding indictment charged Samuel Smith in Count 19 with intentional distribution of cocaine in violation of 21 U.S.C. § 841(a)(1) but did not specify any particular quantity. Smith points out that the evidence at trial showed only relatively small quantities involved in his sales of cocaine to Alice Rolle. However, the Sentencing Guidelines directed the district court to determine the offense level for Smith's possession offense on the basis of his co-conspirators conduct "in furtherance of the conspiracy that was known to the defendant or was reasonably foreseeable." U.S.S.G. § 2D1.4 application note 1 (Jan. 1988).[4] *See U.S. v. Alston*, 895 F.2d 1362, 1371 (11th Cir.1990). The finding in ques-

tion then is whether Smith knew, or could reasonably have foreseen, that the activity of the conspiracy in the aggregate would involve more than five kilograms of cocaine.

We cannot meaningfully review the district court finding as to amount because the record contains no transcript of Samuel Smith's sentencing hearing. Trial counsel was permitted to withdraw and new counsel was appointed for appeal. Under the circumstances of this change of counsel we pretermit consideration of this contention by Smith and retain jurisdiction of this issue. Appellate counsel is directed to file a transcript of the sentencing hearing within 30 days.

### C. MULTIPLE FIREARM CONVICTIONS

■■■ As stated in part II, Hicks and A.J. Smith were charged with numerous counts of possession of a firearm by a convicted felon. These defendants and the government agree that four of the separate charges against Hicks constitute only one chargeable offense and that three of the separate charges against A.J. Smith constitute only one chargeable offense. Accordingly, we vacate the sentences imposed on Hicks under counts 25, 26, 27, and 28 and the sentences imposed on A.J. Smith under counts 10, 11, and 12. We remand this matter to the district court with instructions that the convictions of Hicks on three of counts 25–28 and of A.J. Smith on two of counts 10–12, at the election of the government, are to be reversed and those counts are to be dismissed. The convictions on the remaining count in each group against each defendant shall be deemed affirmed and the defendants resentenced on the remaining firearm count. *See U.S. v. Bradsby*, 628 F.2d 901, 905–06 (5th Cir. Unit A 1980).[5]

---

4. We cite to the text of the Guidelines in effect at the time Samuel Smith was sentenced. This portion of Application Note 1 of § 2D1.4 was amended effective November 15, 1989. *See U.S. v. Alston*, 895 F.2d 1362, 1370 (11th Cir.1990).

5. A.J. Smith moved to dismiss these counts against him prior to trial on the grounds of

multiplicity, and the district court denied his motion. Accordingly, on appeal he essentially challenges the multiple convictions entered against him, as well as the multiple sentences. Defendant Hicks, however, raises this issue for the first time on appeal. Technically, he has waived his ability to challenge the multiple convictions on appeal. *E.g., U.S. v. Grinkiewicz,*

## V.

We VACATE the sentences imposed on Hicks under counts 25, 26, 27, and 28 of the indictment and the sentences imposed on A.J. Smith under counts 10, 11, and 12 of the indictment and REMAND to the district court with instructions that the convictions of Hicks on three of counts 25–28 and of A.J. Smith on two of counts 10–12, at the election of the government, are to be reversed and those counts are to be dismissed.

We retain jurisdiction of the single issue of the correctness of the sentence imposed on Samuel Smith under Count 19. Counsel for Samuel Smith is ORDERED to file a transcript of the sentencing hearing within 30 days.

In all other respects, we AFFIRM.

873 F.2d 253, 255 (11th Cir.1989) (per curiam) (citations omitted). However, he may still challenge the imposition of multiple sentences for convictions at this stage. *Id.* Although we recognize this difference between the two defendants, we see little reason to treat them differently in this case. We will grant the same relief as in *Bradsby,* which featured a similar situation. That case is binding precedent in this circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).