[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-10184
_____

D.C. Docket No. 3:10-cr-00276-MMH-TEM-2


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MAYNARD KENNETH GODWIN,
a.k.a. KG,
ERIC STEVEN ELLIS,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(September 3, 2014)

Before ED CARNES, Chief Judge, TJOFLAT and SILER,[*] Circuit Judges.

ED CARNES, Chief Judge:

_____

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

In a case of life imitating art imitating life, Maynard Kenneth Godwin was inspired by the fictional motorcycle gang in <u>Sons of Anarchy</u>, itself modeled on the real life Hells Angels, to form his own band of brigands called the Guardians. Under his leadership, the Guardians terrorized the citizens of Jacksonville, Florida, through a steady onslaught of home invasion robberies, armed bank robberies, and other crimes.  Although not a full-fledged, card-carrying member of the Guardians, Eric Steven Ellis personally participated in at least two of those crimes, received a share of the proceeds from a third, and otherwise associated with several of the gang's members.

Following a joint trial before two separate juries, one for each codefendant, Godwin and Ellis were convicted under the Racketeer Influenced and Corrupt Organizations Act (RICO) for racketeering, in violation of 18 U.S.C. § 1962(c), and conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d).  They challenge their respective convictions.  Godwin contends that the district court erred in excusing two members of his jury, one before the trial started and the other during deliberations, while Ellis challenges the sufficiency of the evidence to support his racketeering and conspiracy convictions.

## I.

As often seems to be the protocol with criminal gangs, the members of the Guardians were given monikers befitting their roles.  Godwin bestowed on himself

the apt title "Boss."  Bill Harper and Billy Hesson were the Lieutenants; Andrew Wilkie was the Enforcer; Frank Godwin was the Road Captain; and Brock Skov, owing to his computer savvy, was called Tech.[1]  The members wore dog tags inscribed with the organization's name, their nicknames, and their rank; some sported "Guardian" tattoos; and several rode motorcycles, used steroids, and lifted weights.  Although Godwin did not formally name and officially organize the group into the Guardians until early to mid-2009,[2] its members were involved in criminal activities together before then.

Godwin sold various drugs, principally cocaine and oxycodone, and fenced stolen merchandise from his home and later from his store, "Guardians of Jacksonville," which he opened in 2010.  At Skov's residence, Godwin stockpiled a cache of body armor and firearms for Guardian members and associates to use with his permission.  Jonathan Hart and David Hicks were two such associates; Eric Ellis was a third.  Like Guardian members, Ellis used steroids, lifted weights, and spent time at Godwin's house.  He knew that the Guardians were a gang that

---

[1] Because Ellis challenges the sufficiency of the evidence to support his convictions, the facts are presented in the light most favorable to the government, with all reasonable inferences and credibility determinations drawn in favor of the guilty verdict.  See United States v. Broughton, 689 F.3d 1260, 1276 (11th Cir. 2012).

[2] The actual founding date of the Guardians was the subject of some dispute at trial. Hesson, for example, testified that the Guardians were named sometime during the summer of 2009; Harper maintained that the organization officially came into being on May 21, 2009; and Skov insisted that the group formed before May 2009.  Given our responsibility to view the evidence in the light most favorable to the jury's verdict, we assume that the Guardians came into being before May 2009, as Skov testified at trial.

3

did "goon stuff," were "heavy into drugs," and were led by Godwin.  On one occasion in June or July of 2010, Ellis, Wilkie, and Harper convened at Godwin's house bedecked in black and carrying backpacks.  Godwin called Skov at home to tell him that he was sending the three men "over there to get something from you," and then turned and asked the men, "Do y'all want the one with the extended clip on it?," obviously referring to a firearm.

Stockpiling guns, dealing drugs, and peddling purloined products were not the most serious of the Guardians' illicit endeavors.  In a span of only fifteen months, beginning in May 2009, Guardian members and associates committed a slew of violent crimes, including four armed home invasion robberies, two armed bank robberies, one attempted bank robbery, and a savage beating.  On May 21, 2009, Ellis, Harper, and Wilkie, acting at Godwin's command, thrashed Dillon Burkhalter to within an inch of his life, repeatedly hitting and kicking him in the face until he began choking on his own blood.  Burkhalter, who rented a mobile home located next to one owned by Godwin, had been "messing up [his] trailer," owed back rent to the owner of the trailer park, and apparently owed money to Godwin as well.  When he was transported to the hospital with multiple facial fractures and cranial bleeding, Burkhalter was barely breathing, barely conscious, and utterly unresponsive, eventually lapsing into a coma for a period of three weeks.

4

Less than three weeks later, on June 12, 2009, Ellis, Hicks, and Wilkie broke into the home of Brigg and Lita Hart (no relation to Jonathan Hart) under cover of night. They roused Lita Hart from her bed at gunpoint, forced her to open the bedroom safe, and then absconded with $328,000 in cash, $750,000 in jewelry, and a veritable trove of firearms, including an H&K shotgun, two matching 9mm Mauser pistols, and a 9mm Ruger pistol with an extended magazine. The jewelry taken from the Harts' home included two black diamond rings, a diamond-studded gold necklace, several expensive watches, and assorted diamond bracelets.

Ellis received as his share of the loot a third of the $328,000 in cash, the diamond-studded gold necklace, and two expensive watches. And he stored five of the stolen firearms, including the matching Mauser pistols, at his apartment. Several of the other stolen firearms were added to the Guardians' arsenal at Skov's home. Ellis later gave Lita Hart's gold necklace to his brother, who broke it apart, put one of the two diamonds into his wife's wedding ring, and returned the other diamond to Ellis. Ellis sold the remaining diamond to a jewelry store for a total of $9,000, paid out over five separate checks, and kept the proceeds for himself. Wilkie and Hicks also sold some of the Harts' jewelry to Ron Gordon at San Juan Precious Metals, who was affectionately and alliteratively known to the Guardians as the "gold guy."

5

On September 1, 2009, Hart, Hicks, and Wilkie unsuccessfully attempted to rob an EverBank branch, a feat that Hart and Hicks successfully completed the following month.  Also in October 2009, Hart and Hicks committed a second home invasion robbery using a gun stolen from the June 2009 home invasion, while Wilkie and Hicks robbed a Wachovia Bank at gunpoint.  On November 30, 2009, Wilkie and Hart committed a third home invasion, the robbery of the residence of Vicki and Harold Shafer, again using a firearm stolen during the June 2009 home invasion.  Wilkie and Hart made off with over $400,000 in cash and jewelry, as well as a 2004 Lexus.  After the robbery, Wilkie called Ellis and told him to come over to Hart's house, where Wilkie and Hart gave him $2,000 in stolen cash.  Wilkie advised Hart that Ellis could double that money by selling cocaine.  And in August 2010, Wilkie and Harper committed one last home invasion robbery, this one of Robert and Larita Holland, the proceeds of which they shared with Godwin.  In all but one of the six robberies committed by Guardian members and associates between June 2009 and August 2010, the perpetrators wore dark clothes, masks, and gloves.

Ellis helped Wilkie organize some of the home invasion robberies, including those committed by Harper and Hicks.  He also assisted Guardian members and associates in other ways.  The day after the November 2009 robbery, Hart summoned Ellis, Wilkie, and Hicks to his home to determine who had taken his

6

share of the proceeds from that crime.  Ellis arrived with an "Uzi looking pistol,"

and he vigilantly stood holding it the entire time.  Although it was never

determined who had filched the stolen proceeds, Hart believed that it was Hicks

and, from that day forward, the Guardians severed all communication with him.

Around the same time period, Wilkie battered his girlfriend, Chelsea

Folkestad, for asking too many questions about the Guardians.  Folkestad had

overheard Wilkie and Ellis discuss doing "jobs," meaning home invasions and

bank robberies.  Wilkie called Ellis to help him with Folkestad and when Ellis

arrived, he laid a bed sheet down on the bedroom floor and told Wilkie that he

wanted to talk to Folkestad in the bathroom, leading Folkestad to believe that he

was going to kill her and then wrap her body in the sheet.  Ellis escorted Folkestad

into the bathroom, where he issued a somewhat veiled threat:  "If you don't say

anything or don't bring this up or don't ask any more questions and just leave this

alone . . . it will be fine.  Otherwise, you already know."

For a two-and-a-half-month stretch from February 21 to May 8, 2010,

Wilkie was in jail for, of all things, driving with a suspended license.  In recorded

jail calls, Wilkie, Godwin, Hart, and Harper discussed ways to get money to pay

Wilkie's bail and pay his attorney, including by selling the H&K shotgun stolen

during the June 2009 home invasion and by having the other men commit yet

another home invasion robbery.  Ellis' name frequently came up during those

7

conversations. To help raise bail money for Wilkie, Ellis sold two of the expensive watches stolen during the June 2009 robbery to the Guardians' "gold guy" at San Juan Precious Metals.

Life as usual began to unravel for the Guardians after Wilkie's cousin, Christopher Stevens, contacted the police in the final months of 2009 and agreed to act as a paid informant for the Federal Bureau of Investigation. Beginning on February 19, 2010, and stretching through October of that year, Stevens engaged in a series of recorded drug buys of anabolic steroids, cocaine, and oxycodone from Wilkie, Harper, and Godwin. At trial, Stevens testified that Ellis was the source of the steroids. Folkestad corroborated that testimony, stating that Ellis supplied Wilkie with some of the drugs that he sold to others. During two of the recorded conversations, Stevens asked Wilkie about obtaining a "throwaway" gun that he ostensibly intended to use to kill a coworker. Wilkie eventually told Stevens that he could buy a throwaway gun from Ellis. In another recorded conversation from September 2010, which took place at Godwin's store, Wilkie informed Stevens that he and Ellis had some robberies "lined up," robberies that could not "come back on [Godwin]."

In October 2010, the FBI began intercepting calls made over Godwin's phone, which Wilkie occasionally used. On October 22, 2010, Wilkie asked Ellis to meet him at Godwin's trailer with "the two girls that . . . we call a nine," which

8

was code for the matching 9mm Mauser pistols stolen during the June 2009 home invasion. Ellis replied that the majority of his "gear" was at Godwin's house and that he would meet Wilkie there later that night. When Ellis arrived at Godwin's place, Wilkie told him that "there was some drug dealer or some kid that was sitting on money that he wanted to go roll." The two did not, however, go through with Wilkie's plan. During a recorded phone conversation that took place three days later, on October 25, 2010, Ellis asked Wilkie what was happening with "the kid we were suppose[d] to go visit." The two agreed to "get that shit underway," and Wilkie also mentioned doing a "one time lick," meaning a robbery, on Black Friday because of the amount of money that would be circulating that day. Ellis replied that they could "put [their] heads together" and "do a hand full of things."

In another series of recorded phone calls that were made in early November, Godwin and Wilkie discussed a planned invasion of a home occupied by an elderly couple who kept nearly $300,000 in their house. To prevent that crime from happening, law enforcement officials arrested Godwin and Wilkie on November 12, 2010. Following those arrests, officers searched the homes of several Guardian members and associates. In Godwin's home, they found steroids, drug paraphernalia, two bags of white powder, body armor, ammunition, a dog tag inscribed with the word "Guardian," Wilkie's identification card, and a business card from the Guardians' "gold guy." During an earlier search of Godwin's trash,

9

FBI agents had also found various documents and credit cards belonging to Larita and Robert Holland, the victims of the August 2010 robbery committed by Wilkie and Harper.

On a desk in Ellis' apartment, officers found the matching 9mm Mauser pistols from the June 2009 home invasion, both loaded, lying beside a calendar that prominently marked the day after Thanksgiving as "Negro Friday." Elsewhere in the apartment were steroid bottles and syringes, as well as a duffel bag containing several other guns taken during the June 2009 home invasion, a toolbox, ammunition, and a pair of gloves. And in Skov's apartment, officers found vials of steroids, boxes of ammunition, seven bullet-proof vests, and fifteen firearms, some of which had also been stolen during that same June 2009 home invasion.

## II.

Godwin and Ellis, along with Wilkie, Harper, Hart, and Skov, were indicted by a federal grand jury on charges of racketeering, in violation of 18 U.S.C. § 1962(c) (Count 1), and conspiracy to commit racketeering, in violation of § 1962(d) (Count 2).[3] For the substantive RICO charge alleged in Count 1, the second superseding indictment, which is the one that carried the case to trial,

---

[3] Ellis and Godwin were each charged with one additional offense. Ellis was charged with committing a violent crime in aid of racketeering — namely, threatening to kill or seriously injure Chelsea Folkestad to prevent her from reporting the Guardians' criminal activities to the police and for the purpose of maintaining his position within the organization. See 18 U.S.C. § 1959(a)(4). Godwin was charged with possessing a firearm as a convicted felon. See id. § 922(g). The two were ultimately acquitted on those charges.

identified twenty-four predicate racketeering acts, including:  extortion, home invasion robbery, attempted bank robbery, armed bank robbery, conspiracy to commit armed robbery, money laundering, transferring stolen goods, and various drug trafficking offenses.  Ellis was specifically charged with four of those predicate acts:  (1) extortion of Dillon Burkhalter; (2) the June 2009 home invasion robbery of the Harts; (3) promotional money laundering in the form of selling one of Lita Hart's diamonds; and (4) conspiring with Wilkie in October 2010 to commit armed robbery.  Wilkie, Harper, Hart, and Skov pleaded guilty to the racketeering charges against them; Godwin and Ellis did not.[4]

Because Godwin and Ellis would be tried together and there were potential Confrontation Clause problems, the district court empaneled two separate juries, one for each codefendant.  See generally Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620 (1968).  At the beginning of the selection of Godwin's jury, the court notified the potential jurors that the trial was expected to last as long as four-and-a-half weeks.  One of the potential jurors, Casey Andeer, had attended but not completed law school and worked part-time as a paralegal at her father's law firm; she devoted the rest of her time to caring for her 14-month-old son.  When the court asked the venire members whether the anticipated length of the trial would

---

[4] Wilkie was later sentenced to 420 months in prison, Hart to 105 months, Harper to 100 months, and Skov to 41 months.

11

cause any extraordinary hardships, Andeer raised her hand and explained that it would because she was the primary caregiver for her toddler.

Neither side moved to strike Andeer and, through a process of elimination, she was selected to serve on Godwin's jury. Immediately upon hearing that news, she became visibly distraught and began crying in the jury box. As a result, the prosecutor suggested that the court excuse Andeer, replace her with one of the three alternate jurors, and proceed with only two alternates. When questioned by the court about her emotional state and whether she would be able to obtain child care during the duration of the trial, Andeer stated that she was "pretty upset" about the prospect of not seeing her child for a month and rhetorically asked, "I'm going to start him in day care when he's 14 months old?" Godwin objected to excusing Andeer and the court deferred ruling on the issue.

After the court had recessed for the day, Andeer's father called the courthouse to reiterate his daughter's distress about having to serve on Godwin's jury. When court reconvened the following morning, the judge notified the parties that Andeer's father had called to say "how distraught she was at having to serve" and explained that the call had "cemented in [the judge's] mind that even if we seated her as a juror, we would lose her within a week." Concerned that Andeer would "be affected by . . . her opposition to being away from her child" and would be "unable to and . . . unwilling to focus her attention on the trial," the court

12

thought it best to excuse Andeer for cause.  Before finalizing its decision, however, the court asked Andeer if she had made child care arrangements for the anticipated length of the trial and, if so, whether she could "give the case [her] full attention" or would "be distracted by [her] concern about [her] child."  Although Andeer indicated that she had made child care arrangements for that week and was working on the other weeks, she stated that, as "a first-time mom," she "absolutely [would] be distracted about concern for [her] child," would not be able to give the case her full attention, and was "not going to start [her] son in school or day care" at that time.  Convinced that Andeer's concern for her son would "affect her ability to serve as a juror," the court excused Andeer and replaced her with an alternate juror.  Godwin's jury was then sworn in.

The trial lasted three weeks and featured over three dozen government witnesses, including codefendants Hart, Harper, and Skov; Guardian member Hesson; Wilkie's former girlfriend Chelsea Folkestad; and the many victims of the Guardians' crimes.  After the prosecution rested, Ellis moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29.  The court took that motion under advisement, after which Ellis testified in his own defense.  He admitted to his involvement in the June 2009 home invasion, admitted to selling one of the Harts' diamonds to a jewelry store, admitted to selling their other jewelry to the Guardians' "gold guy" in order to raise bail money for Wilkie, and admitted to

being present during the May 2009 beating of Burkhalter.  Still, he denied being a member or associate of the Guardians.  And in direct contrast to the trial testimony of the government's witnesses, including Lita Hart, Harper, Skov, and Folkestad, Ellis denied hitting Burkhalter, denied threatening Folkestad, and denied that Lita Hart had been confronted at gunpoint during the robbery of her home.  Ellis renewed his motion for a judgment of acquittal at the close of all the evidence, which the district court denied.

Before the two juries retired for deliberations, the judge instructed them on the elements of a substantive RICO offense and of conspiracy to violate RICO, and admonished the jurors that they were bound to "follow the law as I explain it, even if you do not agree with the law."  After one full day of deliberations, Godwin's jury sent out a note:

> Does conspiracy include planning of acts that did not occur or act[s] that did occur?  We have read your instructions over and over, but some people do not comprehend the instructions.  Also, if we can't agree on Count One [the substantive RICO count] but agree on everything else, what do we do?"

The judge responded:

> The requirements for conspiracy under state law [for the predicate RICO acts] are set forth in instruction No. 24 and conspiracy under federal law for Count Two [conspiracy to violate RICO] in instruction No. 26.  So long as those requirements are met, a conspiracy can include either one, an act that did not occur or an act that did occur.  As to your second question, I would ask you to continue your deliberations at this time.

14

Later that day, the Godwin jury sent out another note stating that: "We have a person who has made up its [sic] mind as far as the Counts One and Two regardless of your instructions. How do we proceed? He disagrees with your instructions. They [sic] want to base conspiracy on home invasion only. Please help." The trial judge reminded the jurors of their "sworn duty" to "follow the law set forth in my instructions," whether or not they "agree[d] or disagree[d] with those instructions." The court's reminder did not resolve the problem; less than an hour later, the Godwin jury notified the court that "[h]e will not agree with your instructions. We can't go any further."

With the parties' consent, the district court questioned each juror individually about whether any juror was refusing to deliberate, to follow the court's instructions on the law, or to apply those instructions to the evidence presented. Eleven of the twelve jurors indicated that Juror 10 either refused to the follow the court's legal instructions or to apply those instructions to the evidence. Nine of those eleven jurors elaborated on their answers, explaining that Juror 10 had indicated that he "doesn't agree with the law" and "didn't care what the law said"; had asserted that the court's instructions were "not right" and did not accurately reflect what "the law is"; had an understanding of the law that was "totally different" from the court's instructions; and had declared that he was going with his own opinion "over the rules to be followed" and the trial judge's

15

definitions.  Juror 10, not surprisingly, denied that he was refusing to follow the court's legal instructions; he was the only juror who denied that he was.

Based on the jurors' statements, the government moved to excuse Juror 10 under Federal Rule of Criminal Procedure 23(b)(3).  Over Godwin's objections and after considering the matter overnight, the district court granted the government's motion, finding that Juror 10 "has refused to follow the Court's instructions and to apply the law as instructed to the facts of this case," that he "simply disagrees with what the law is," and that there was "no substantial possibility that [he] is basing his disagreement or his decision on the sufficiency of the evidence."  In making those findings, the district court stressed the fact that eleven jurors had "unanimously described [Juror 10] as refusing to follow the law" and that their responses to the court's questions, unlike Juror 10's, were "unequivocal, specific, consistent, and credible."  The court replaced Juror 10 with one of the alternate jurors and instructed Godwin's jury to begin deliberations anew.

After four hours of deliberations, the jury found Godwin guilty on Counts 1 and 2 — the substantive and conspiracy RICO counts.  Ellis' jury also returned a guilty verdict on those two counts, specifically finding that he had committed three of the four predicate acts alleged in the indictment: the June 2009 home invasion robbery, money laundering, and conspiracy to commit armed robbery.  Ellis again

16

renewed his motion for a judgment of acquittal; the court again denied it.  He was later sentenced to 20 years imprisonment, while Godwin received a sentence of 30 years.

### III.

Godwin challenges the district court's decisions to excuse juror Andeer before the start of trial and Juror 10 during deliberations.

We review a district court's decision to excuse a juror only for an abuse of discretion.  United States v. Register, 182 F.3d 820, 839–40 (11th Cir. 1999).  A district court may remove and replace a seated juror before deliberations begin whenever "facts arise . . . that cast doubt on [that] juror's ability to perform her duties."  United States v. Smith, 918 F.2d 1501, 1512 (11th Cir. 1990); see also United States v. Fajardo, 787 F.2d 1523, 1525 (11th Cir. 1986) ("The decision to remove a juror and replace him with an alternate is entrusted to the sound discretion of the trial judge whenever facts are presented which convince the trial judge that the juror's ability to perform his duty as a juror is impaired.") (quotation marks omitted); Fed. R. Crim. P. 24(c) ("The court may . . . replace any jurors who are unable to perform or who are disqualified from performing their duties.").  We will not disturb a district court's decision to remove a juror before deliberations "absent a showing of bias or prejudice," which includes removal "without factual support, or for a legally irrelevant reason."  Fajardo, 787 F.2d at 1525 (quotation

17

marks omitted); see also United States v. Bradley, 644 F.3d 1213, 1281 (11th Cir. 2001) (same).

Once deliberations have begun, a district court may excuse a juror for good cause, which includes that juror's refusal to apply the law or to follow the court's instructions.  See Fed. R. Crim. P. 23(b)(3); United States v. Abbell, 271 F.3d 1286, 1302 (11th Cir. 2001).  But because of "the danger that a dissenting juror might be excused under the mistaken view that the juror is engaging in impermissible nullification," a district court should excuse a juror during deliberations "only when no 'substantial possibility' exists that she is basing her decision on the sufficiency of the evidence."  Abbell, 271 F.3d at 1302.  So long as the district court applies the "substantial possibility" standard, we will review a factual finding that a juror is refusing to follow the law only for clear error, bearing in mind that "the district court is uniquely situated to make the credibility determinations that must be made" whenever "a juror's motivations and intentions are at issue."  Id. at 1302–03.

## A.

Godwin contends that the district court erred in two ways in excusing juror Andeer before the start of the trial.  One way the court did so, he argues, was by considering the statements of Andeer's father about how distressed she was over having to serve on the jury and not being able to personally take care of her 14-

18

month-old son during the duration of the trial.  The father communicated that message to the judge by calling the courthouse after regular business hours.  While it is unclear whether he spoke with the judge or someone else, the judge did get the message.  Neither side was present when the father made those statements to whomever he made them, or when the judge learned of them (if the father did not talk with her directly), but when court convened the next morning the judge immediately notified the parties of the phone call and the father's statements.

After being notified of the father's statements, Godwin had an opportunity to address them and object to the court's consideration of them, but he did not.  The district court did not solicit the father's statements, it promptly brought them to the parties' attention, and neither side objected to the court considering those statements.  Under those circumstances, the court did not err or abuse its discretion in considering the father's statements.  See United States v. Puche, 350 F.3d 1137, 1152–53 (11th Cir. 2003) (upholding a district court's decision to excuse a juror following an in camera interview where the court promptly notified the parties of the juror's situation); United States v. Adams, 799 F.2d 665, 669 (11th Cir. 1986) (explaining that a "district judge should be afforded a considerable measure of discretion in handling . . . inadvertent situations" and that it is preferable if the court notifies the parties whenever it learns of an improper communication); see also United States v. Gagnon, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484 (1985)

("The mere occurrence of an <u>ex parte</u> conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right.") (quotation marks omitted).

The second way Godwin contends the district court erred was its actual decision to excuse Andeer from the jury. He argues that she could have made child care arrangements for her 14-month-old son that would have enabled her to serve as a juror. That is, of course, not the question. If forced to choose between making arrangements for someone else to care for her toddler or leaving him home alone without care, a mother will make child care arrangements. The question is whether it was an abuse of discretion for the court not to force Andeer to leave her child in the care of someone else during the day for the duration of the trial, which was expected to last four-and-a-half weeks, when the prospect made her so distraught that she began crying in open court. To ask the question is to answer it. A distraught juror is unlikely to be an attentive one. Andeer herself confirmed the obvious when the court asked her if she could "give the case [her] full attention" or would "be distracted by [her] concern" for her 14-month-old son. She unequivocally answered that she "absolutely [would] be distracted about concern for [her] child."

The court justifiably found that Andeer would "be affected by . . . her opposition to being away from her child" and would be unable or unwilling to

focus on the trial.  See Smith, 918 F.2d at 1511–12 (affirming a district court's decision to excuse a juror who made holiday plans with her family, where the court was "convinced that she would be unable to deliberate effectively because of her concern over spending Christmas vacation with her family"); United States v. Shelton, 669 F.2d 446, 460 (7th Cir. 1982) (upholding the removal of a juror whose teenage niece was visiting from out of town and who "indicated that she could still serve despite having to leave her niece stranded without transportation" because the district court was "concerned about the effect of a potentially impatient and disgruntled juror on the jury in the context of a lengthy trial").

Not only was the district court's decision well within its discretion, but Godwin has also failed to demonstrate that he was prejudiced by the removal of juror Andeer.  See Fajardo, 787 F.2d at 1525.  Godwin argues that Andeer, as a paralegal who had attended law school for a while, "would have had a clear understanding of the judge's instruction on the definition of what constituted a criminal enterprise."  That argument is speculative at best and assumes that the alternate who replaced her did not (or could not) understand the court's instructions.  See Puche, 350 F.3d at 1153 (explaining that speculation is insufficient to show prejudice); United States v. De La Vega, 913 F.2d 861, 869 (11th Cir. 1990) (finding no prejudice from a juror's replacement with an alternate because they "were drawn in the same net, and being once drawn, were afforded

21

the precise same treatment.") (quotation marks omitted).  Godwin's assumption that the alternate who replaced Andeer did not understand the judge's instructions flies in the face of the basic "presumption that juries follow their instructions, a presumption that only has meaning if we also assume that juries understand their instructions."  United States v. Stone, 9 F.3d 934, 940 (11th Cir. 1993).

## B.

Godwin also contends that the district court abused its discretion in removing Juror 10 after the jury began its deliberations.  He argues that the answers that the jurors gave about that juror's behavior during the deliberations failed to establish that he was refusing to follow the court's instructions on the law, and instead showed that he was a juror in the minority who was "doing his best to inter[pret]" those instructions.

The district court explicitly applied the correct standard, which is whether there was a substantial possibility that the juror who was removed was merely espousing the view that there was insufficient evidence to convict instead of refusing to follow the court's instructions.  See Abbell, 271 F.3d at 1302–03.  Because the court did that, the only question is whether it clearly erred in finding that the juror was refusing to follow the instructions.  Id.  It is seldom easy to establish clear error.  It is especially difficult to do so in this situation where the district court was on the scene, viewed the jurors as they described the problem,

22

and therefore was "uniquely situated to make the credibility determinations that must be made" whenever "a juror's motivations and intentions are at issue." Id. at 1303.

Godwin's jury submitted two notes to the district court within a single hour, both of which stated that one juror did not agree with the court's instructions on the law. When questioned by the court, every juror except for Juror 10 indicated that Juror 10 refused to follow the court's instructions or to apply those instructions to the evidence presented at trial. And nine of those eleven jurors elaborated that Juror 10 either did not agree with the law or did not agree with the court's instructions on the law. After listening to what the twelve jurors had to say and observing their demeanor as they said it, the district court specifically found that the statements of every juror but Juror 10 were "unequivocal, specific, consistent, and credible," that Juror 10 "refused to follow the Court's instructions," and that there was "no substantial possibility that [Juror 10] is basing his disagreement or his decision on the sufficiency of the evidence." It would have been surprising if the court had not credited the testimony of the other eleven jurors over Juror 10's denials. There was no clear error. See Abbell, 271 F.3d at 1302; see also Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575, 105 S.Ct. 1504, 1512 (1985) ("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially

plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.").

Even if we had some doubt about this matter, which we don't, we would be compelled to reach the same result because of our binding precedent in Abbell, where we affirmed a district court's removal of a juror during deliberations under circumstances materially identical to those that led to the removal of Juror 10 in this case. In that case the jury submitted a note (here it submitted two notes) to the district court indicating that a juror was not applying the law as instructed. Abbell, 271 F.3d at 1302. When questioned by the court, a majority of the jurors in that case (all eleven of the other jurors in this case) said that one juror would not consider the evidence or discuss the applicable law, and several of them reported (as nine of the jurors reported in this case) that the rebellious juror had even stated that she was not going to follow the law. Id. at 1303–04 & n.18. Faced with those circumstances, we held in Abbell that "the district court's determination that [the juror] was not basing her decision on the sufficiency of the evidence was not clearly erroneous." Id. at 1304. The same is true here.

## IV.

Ellis challenges the sufficiency of the evidence to support his convictions on Count 1 for racketeering and on Count 2 for conspiracy to commit racketeering. With respect to both counts, Ellis makes three broad, largely overlapping

24

arguments:  (1) that there was no evidence that he was associated with the Guardians, participated in the gang's affairs, or conferred any income or other benefit on the enterprise through his criminal acts; (2) that the three predicate acts found by the jury — the June 2009 home invasion robbery, money laundering, and conspiracy to commit armed robbery — were unrelated to the Guardians; and (3) that the government failed to prove that he committed two of those three predicate acts, money laundering and conspiracy to commit armed robbery.  He also contends that the evidence adduced at trial established multiple conspiracies, not the single RICO conspiracy alleged in the indictment, because there was no "common goal to participate in [the] enterprise," "the nature of the underlying scheme was unorganized and sporadic," and "the members of the alleged conspiracy engaged in unconnected and independent criminal activity."[5]

A.

We review de novo the sufficiency of the evidence to support a conviction, "viewing the evidence in the light most favorable to the verdict and drawing all

---

[5] Submerged within his sufficiency arguments, Ellis in a cursory fashion complains about the district court's denial of his motion for a bill of particulars, the admission of "other individuals' irrelevant bad acts," the accuracy of the factual bases of his codefendants' plea agreements, the prosecution's closing argument, and the joinder of his case with those of his codefendants.  Because those claims are not designated as discrete issues in his brief to this Court and are not supported by legal authority and substantive analysis, they are not properly before us.  See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681–82 (11th Cir. 2014) (explaining that an appellant abandons a claim by failing to list it in his statement of the issues, failing to "devot[e] a discrete section of his argument" to it, raising it "in a perfunctory manner without supporting arguments and authority," or burying it within a larger argument) (quotation marks omitted).

25

reasonable inferences and credibility choices in the verdict's favor." United States v. Pacchioli, 718 F.3d 1294, 1299 (11th Cir. 2013).  A guilty verdict "cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." United States v. Rodriguez, 732 F.3d 1299, 1303 (11th Cir. 2013).  Because a jury is free to choose among the reasonable constructions of the evidence, "it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." United States v. Williams, 390 F.3d 1319, 1323–24 (11th Cir. 2004) (brackets and quotation marks omitted).

## B.

RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  It also makes it unlawful for "any person to conspire" to commit that offense.  Id. § 1962(d).  To establish a substantive RICO crime, the government must prove:  (1) the existence of an enterprise; (2) that the enterprise affected interstate commerce; (3) that the defendant was employed by or associated with the enterprise; (4) that the defendant participated, either directly or indirectly, in the enterprise's affairs; and (5) that the defendant participated through a pattern of

racketeering activity. United States v. Browne, 505 F.3d 1229, 1257 (11th Cir. 2007). Ellis' arguments focus on the third, fourth, and fifth elements of a § 1962(c) offense.

The third and fourth elements of a RICO violation — that the defendant was associated with the enterprise and that he participated in its affairs — substantially overlap. See United States v. Watchmaker, 761 F.2d 1459, 1476 (11th Cir. 1985) ("The substantive proscriptions of the RICO statute apply to insiders and outsiders — those merely 'associated with' an enterprise — who participate directly and indirectly in the enterprise's affairs . . . .") (quotation marks and second emphasis omitted). Under the governing "operation or management test," the defendant must have played "some part in directing [the enterprise's] affairs," which includes implementing or making decisions related to its affairs. United States v. Starrett, 55 F.3d 1525, 1542, 1548 (11th Cir. 1995). Because "[t]he RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise," Watchmaker, 761 F.2d at 1476 (quotation marks omitted), even lower-rung participants or virtual outsiders may, by virtue of their conduct, find themselves ensnared. See Starrett, 55 F.3d at 1542 ("[A]n enterprise is 'operated' also by lower-rung participants in the enterprise who are under the direction of upper management, or by others associated with the enterprise who exert control over it.") (quotation marks and alternations omitted); United States v. Castro, 89

27

F.3d 1443, 1452 n.5 (11th Cir. 1996) (rejecting the notion that § 1962(c) "requires significant control over or within an enterprise," and explaining that even "[o]utsiders may exert control over an enterprise's affairs").

The fifth element, a "pattern of racketeering activity," requires proof that the defendant committed at least two predicate racketeering acts that are related both to the enterprise and to each other. Browne, 505 F.3d at 1257.[6] To be related to the enterprise, the predicate acts need not "affect the everyday operations of the enterprise" or even benefit the enterprise. Starrett, 55 F.3d at 1542–43 & n.10; see also United States v. Welch, 656 F.2d 1039, 1062 (5th Cir. Unit A 1981) (rejecting a requirement that the predicate acts actually benefit the enterprise)[7]; United States v. Grubb, 11 F.3d 426, 439 (4th Cir. 1993) (same). And predicate acts are related to each other if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Starrett, 55 F.3d at 1543 (quotation marks omitted).

---

[6] A pattern of racketeering activity also requires a showing of continuity, but Ellis does not advance any arguments concerning that requirement. See United States v. To, 144 F.3d 737, 747 (11th Cir. 1998) ("The fifth element contains two components:  (1) the defendants' predicate acts must be related to the enterprise charged in the indictment; and (2) the predicate acts must actually form a pattern, i.e., relate to each other and have continuity.").

[7] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981), this Court adopted as binding precedent decisions of the Fifth Circuit, including Unit A panel decisions of that circuit, handed down before October 1, 1981.  See United States v. Todd, 108 F.3d 1329, 1333 n.5 (11th Cir. 1997).

C.

When viewed in the light most favorable to the jury's verdict, the evidence was more than sufficient to allow a reasonable jury to find the third and fourth elements of a RICO violation — that Ellis was associated with the Guardians and played some part in directing the enterprise's affairs. The evidence showed that Godwin officially formed the Guardians, which included Harper, Hesson, and Wilkie as members, and Hart and Hicks as associates, and that he did so sometime before the May 2009 beating of Dillon Burkhalter.[8] Although Ellis was not a bona fide, dog-tag wearing member of the organization, he knew that the Guardians were a gang that did "goon stuff," he knew that Godwin was their leader, he spent time at Godwin's house, and he helped Guardian members and associates commit various crimes. Ellis personally participated in both the May 2009 beating of Burkhalter, which was undertaken at Godwin's command, and the June 2009 home invasion robbery, which was carried out with Wilkie and Hicks.[9] He assisted

---

[8] Skov testified at trial that he received his Guardian dog tag from Godwin before the May 2009 beating.

[9] Although the jury acquitted Ellis of the extortion of Burkhalter, that verdict does not preclude a finding that Burkhalter had been beaten and that Ellis participated in the beating because the jury could have acquitted him on another ground. The indictment alleged as a predicate act that Ellis had engaged in extortion under Florida law, which requires a malicious threat of injury to another person "with the intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened . . . to do any act or refrain from doing any act against his or her will." Fla. Stat. Ann. § 836.05. In acquitting Ellis of the predicate act of extortion, the jury could have found that he participated in the May 2009 beating, but that neither he nor his accomplices acted with the requisite intent to extort money from Burkhalter. See Pacchioli, 718 F.3d at 1299 (explaining that we must "view[] the evidence

Wilkie in organizing some of the other home invasion robberies perpetrated by Guardian members or associates, he received a share of the proceeds from the November 2009 robbery of Vicki and Harold Shafer, and later he was summoned by Guardian members to help determine who stole the remaining proceeds of that robbery.  On a different occasion, he was asked to help deal with Wilkie's girlfriend after she had started asking too many questions about the gang.  In order to raise bail money for Wilkie, Ellis sold two expensive watches that had been stolen during the June 2009 home invasion.  He had several conversations with Wilkie about committing additional robberies, including one on Black Friday. And he supplied Guardian members with some of the steroids that they sold to third parties.

Then there is the fact that Ellis elected to take the stand and testify in his own defense, denying that he was associated with the Guardians.  Having seen and heard him testify on the subject, the jury was free not only to discredit his testimony that he was not associated with the Guardians, but also to infer the opposite, and to use that inference as substantive evidence that he was indeed an associate of the enterprise.  United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) ("[A] statement by a defendant, if disbelieved by the jury, may be

_____

in the light most favorable to the verdict and draw[] all reasonable inferences . . . in the verdict's favor").

30

considered as <u>substantive evidence</u> of the defendant's guilt. . . . [W]hen a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true.") (quotation marks omitted); <u>accord</u> <u>United States v. Williams</u>, 390 F.3d 1319, 1325 (11th Cir. 2004); <u>United States v. Mejia</u>, 82 F.3d 1032, 1038 (11th Cir. 1996); <u>United States v. Eley</u>, 723 F.2d 1522, 1525 (11th Cir. 1984); <u>United States v. Contreras</u>, 667 F.3d 976, 979–80 (11th Cir. 1982).

As for the fifth RICO element, a pattern of racketeering activity, the government sufficiently proved that Ellis had committed at least two of the charged predicate acts and that those acts were related both to the Guardians and to each other. Ellis does not dispute his involvement in the June 2009 home invasion robbery, which means that his substantive RICO conviction must stand if the evidence was sufficient to support at least one of the two remaining predicate acts found by the jury. <u>See</u> <u>Browne</u>, 505 F.3d at 1261 ("Reversal of . . . a conviction on a substantive RICO count is not required simply because some predicate acts are factually insufficient, as long as there remain at least two adequately proven acts."). It was. The evidence showed that Ellis had, as alleged in the indictment, committed the predicate crime of promotional money laundering by knowingly conducting a financial transaction involving the proceeds of "specified unlawful activity." <u>See</u> 18 U.S.C. § 1956(a)(1). The unlawful activity was the June 2009

home invasion robbery.  And the evidence showed that Ellis had done so "with the intent to promote the carrying on of [the] specified unlawful activity."  See id. § 1956(a)(1)(A)(i).

Ellis maintains that there was no evidence that he sold Lita Hart's diamond to the jewelry store with the intent of promoting the unlawful objectives of the Guardians.  The relevant question is whether he sold the diamond with the intent to promote the "specified unlawful activity," which was the June 2009 home invasion robbery.  And under our decision in United States v. Carcione, 272 F.3d 1297 (11th Cir. 2001), the only answer that we can give to that question is "yes."  In Carcione, the defendant committed a home invasion robbery with several accomplices, made off with the victim's purse and jewelry, and later sold the victim's diamond ring.  Id. at 1299.  Based on those actions, the defendant was convicted of committing a Hobbs Act robbery, conspiring to commit such a robbery, and promotional money laundering under § 1956(a)(1)(A)(i).  Id. at 1298–99.  We upheld the defendant's money laundering conviction, explaining that "[t]he sale of the diamond was simply one further step in the ongoing Hobbs Act conspiracy" and that the "sale was designed to promote the Hobbs Act conspiracy by turning jewelry into cash — the ultimate objective of the conspiracy."  Id. at 1303.

Carcione is, in all material respects, indistinguishable from this case.  In both cases, the defendant planned and committed a home invasion robbery with cohorts and then sold some of the proceeds of that robbery for cash.  Just as in Carcione, the sale of Lita Hart's diamond was "simply one further step" in the home invasion robbery and "was designed to promote [that robbery] by turning jewelry into cash — the ultimate objective of the [home invasion robbery]."  Id.  Our decision in Carcione therefore forecloses Ellis' contention that the government failed to satisfy the promotional prong of § 1956(a)(1)(A)(i).  And because a pattern of racketeering activity requires only two predicate acts, Ellis' substantive RICO conviction must stand regardless of whether there was sufficient evidence to support the third predicate act found by the jury, conspiracy to commit armed robbery.  See Browne, 505 F.3d at 1261.

To be sure, the two predicate acts of the June 2009 home invasion robbery and the promotional money laundering must be related both to the Guardians and to each other in order to constitute the requisite pattern of racketeering activity.  See id. at 1257.  That standard is met in this case because each of the predicate acts was "related to the activities of the enterprise" and had similar purposes, participants, victims, or methods of commission.  See Starrett, 55 F.3d at 1543 n.10.  The June 2009 home invasion robbery was one of a string of armed robberies committed by Guardian members and associates; Ellis split the proceeds

33

of that robbery with a known Guardian member, Wilkie, and a known Guardian associate, Hicks; guns stolen during that robbery were added to the Guardians' communal cache of firearms and were used to commit two other home invasion robberies; and Ellis sold two expensive watches stolen during that robbery to help raise bail money for Wilkie.  The money laundering offense involved a diamond taken during the June 2009 home invasion and helped to liquidate, if not conceal, some of the fruit of that robbery.

The next issue is whether the government presented sufficient evidence to convict Ellis on Count 2 for conspiring to violate RICO.  See 18 U.S.C. § 1962(d). To establish a RICO conspiracy, "the government must prove that the defendant[] objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes."  Starrett, 55 F.3d at 1543 (quotation marks omitted).  An agreement to participate in a RICO conspiracy may be shown in one of two ways: "(1) showing an agreement on the overall objective of the conspiracy, or (2) showing that the defendant agreed to commit personally two predicate acts, thereby agreeing to participate in a single objective."  Browne, 505 F.3d at 1264 (quotation marks omitted). The evidence, as we have already explained, was sufficient to show that Ellis committed at least two predicate acts related to the Guardians, which alone is enough to find that he agreed to participate in a "single

34

objective" RICO conspiracy.  See id. at 1264; see also United States v. Kopituk, 690 F.2d 1289, 1323 (11th Cir. 1982) ("A defendant's participation in a conspiracy may be inferred from the acts of his which furthered the objectives of the conspiracy.").

Ellis' contention that his conviction on Count 2 cannot stand because the evidence established multiple conspiracies, instead of a single one, ignores the fact that the traditional "distinction between 'single conspiracy' and 'multiple conspiracy'" is largely "irrelevant to RICO conspiracy charges."  United States v. Gonzalez, 921 F.2d 1530, 1540 (11th Cir. 1991); see also Watchmaker, 761 F.2d at 1477 ("Because of the variety of activities which may be undertaken by a criminal enterprise, there are few RICO trials in which such a claim could not be made, and it has been soundly rejected by the courts of this Circuit.").  "[I]n proving the existence of a single RICO conspiracy, the government does not need to prove that each conspirator agreed with every other conspirator, knew of his fellow conspirators, was aware of all of the details of the conspiracy, or contemplated participating in the same related crime."  United States v. Castro, 89 F.3d 1443, 1451 (11th Cir. 1996).  A mere "[a]greement to participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity brings a defendant within the conspiracy regardless of the unrelatedness of the acts of other members of the conspiracy."  Gonzalez, 921 F.2d at 1540.  The jury was justified

35

in concluding that Ellis "objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the [Guardians] through the commission of two or more predicate crimes."  See Starrett, 55 F.3d at 1543.

V.

For these reasons, we affirm Godwin's and Ellis' RICO convictions for racketeering, in violation of 18 U.S.C. § 1962(c), and conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d).

**AFFIRMED.**