[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-11167

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ERIC LAMAR WHITE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 4:21-cr-00309-CLM-JHE-2

_____

Before JILL PRYOR, BRANCH, and HULL, Circuit Judges.

PER CURIAM:

After a jury trial, Eric Lamar White was convicted of (1) aiding and abetting a carjacking, in violation of 18 U.S.C. §§ 2119 and 2 ("Count One"), and (2) aiding and abetting the brandishing of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2 ("Count Two"). On appeal, White argues that there was insufficient evidence to support his convictions. After review of the record and the briefs, we conclude there was ample evidence to convict White of both crimes, and thus we affirm his convictions.

## I.    FACTUAL BACKGROUND

We set forth the trial evidence that showed Kendarian Lamontae Toran ("Toran") and defendant-appellant Eric Lamar White ("White") were in a stolen Chevrolet Equinox that had mechanical issues, and they then carjacked an Acura vehicle driven by victim Kristin Walker ("Walker") and abandoned the Equinox.

## A.    Witnesses and Videos

The government presented testimony from: (1) Michael Ray, the bystander who called 911 after the carjacking; (2) Walker, the victim; (3) Brittany Trunnell, the owner of the stolen Equinox; (4) Troy Dunlap, a detective with the Moody Police Department who was dispatched to the abandoned Equinox in a parking lot; (5) Sergeant Jeff Pitts of the Scott County Sheriff's Department, one

of the initial officers involved in the pursuit of the stolen Acura; (6) Robert Sanders, Assistant Chief of the Madison Police Department and an officer with the Rankin County Sheriff's Department who was involved in the Acura pursuit and arrest of Toran; (7) Ricky Davis, an investigator with the Rankin County Sheriff's Department who was involved in the arrest of White and Toran; (8) Christian Dedmon, an officer in the Rankin County Sheriff's Office narcotics division who was involved in the arrest of White; (9) Special Agent Casey Smith of the Bureau of Alcohol, Tobacco, Firearms, and Explosives who investigated the carjacking; and (10) Special Agent Christopher Baker of the Bureau of Alcohol, Tobacco, Firearms, and Explosives who investigated the carjacking.

The government also presented video surveillance footage from: (1) a Logan's Steakhouse parking lot; (2) the Circle K where the carjacking occurred; and (3) the ADESA parking lot where the stolen Equinox was abandoned. The government also presented Ray's 911 call regarding the carjacking, recordings of defendant White's jail phone calls, dash camera footage from Officer Sanders's vehicle, White's Glock .45 firearm, a photo of White's gun taken by Officer Dedmon, White's cell phone and cell phone records, a photo of the clothing White wore at his arrest, photos of the recovered Equinox, a photo from the state tag readers on I-20 at the Alabama/Mississippi line, and Toran's cell phone and cell phone records. We now review the evidence of the crimes and the witnesses' testimony about what the video surveillance and cell phone records showed.

4                    Opinion of the Court                    23-11167

## B.    Preparation for Trip to Atlanta

In early January 2021, White and Toran planned a trip from Jackson, Mississippi to Atlanta, Georgia.  On January 3, 2021, prior to their trip, Toran informed White that he was at the Park at Moss Creek apartments in Jackson, Mississippi.  Both White and Toran were at this apartment complex before.  The next day, after making sure Toran was alone, White texted Toran in advance of their trip, "Need to find us a whip so we can go to the A."  "Whip" is a term commonly used to refer to a vehicle.  That is exactly what Toran did.

On the morning of January 6, 2021, a 2008 burgundy Chevrolet Equinox was stolen from the Park at Moss Creek apartments.  Within an hour of the theft of the Equinox, Toran called White.  White answered the call, which lasted 46 seconds.  Three minutes later, Toran sent White a text reading "Send it." White responded by sending a map pin.  Within the next 20 minutes, White and Toran had two additional short phone calls.

Approximately an hour later, White texted "Kalungano," a third party, asking "Aye KT straight? He with me. We just came up on a lil lick."[1]  "Lick" is commonly used to refer to a robbery or

---

[1] During his trial testimony, White confirmed that he used "KT" to refer to his co-defendant, Toran.  White also stated that a "lick" "didn't necessarily have to be a robbery" and that it could have meant "any type of financial gain or something to better your situation at the moment."  But on cross examination, White stated that, as used in the text message, "lick" was something "[n]egative but not illegal."

theft.   Kalungano expressed concerns about Toran, responding "Nall cuz i told them stop coming to my house after licks."   That did not deter White from taking the trip with Toran.   Instead, White responded "We already dropped it off out west. My girl was finna bring us out there."

## C.    Trip to Atlanta

Early in the morning on January 7, 2021, White and Toran began their trip to Atlanta driving the stolen burgundy Equinox. White took his black Glock .45 caliber pistol with him and had always known Toran to carry a gun with him.   While on the way to Atlanta, the Equinox began to experience mechanical issues, so White and Toran stopped in Moody, Alabama.   White was driving the stolen Equinox.

## D.    Logan's Parking Lot from Video Surveillance

After exiting the highway, they first stopped at a Logan's Steakhouse restaurant.   They pulled into the parking lot at approximately 1:19 PM, following closely behind a silver BMW sedan.   The BMW parked and two individuals got out of the car almost immediately.   The Equinox circled around the BMW and parked.   In doing so, the Equinox passed a number of available parking spaces.   No one ever got out of the Equinox.   At approximately 1:21 PM, the Equinox left the parking lot.   The Equinox then pulled into a nearby Circle K gas station at approximately 1:23 PM.

### E.    Circle K Carjacking from Video Surveillance

Initially, the Equinox pulled into the gas station and parked in front of the pumps to the far left, with the pumps on the driver's side of the vehicle. The gas tank on a 2008 Equinox is on the passenger side. No one got out of the Equinox. After about 2 and a half minutes, the driver's door opened and then closed almost 15 seconds later.

Then, at approximately 1:26 PM, a white 2008 Acura TL pulled into the parking lot and parked at pump number 9, two rows over from the pumps where the Equinox was parked. The Acura was driven by Walker, who was three months pregnant. Walker's two children, aged nine and six, were in the backseat. Nothing blocked the view of the Acura from the Equinox.

Approximately two minutes later, a large white van pulled up to the pumps between the Acura and the Equinox. Walker got out of her car and started pumping gas. Within 15 seconds, the Equinox backed up and then pulled forward. The Equinox drove all the way around the parking lot, past all of the pumps, circled around, and then stopped in front of pump number 10, the pump on the opposite side of the gas pump the Acura was using. Again, the gas tank on the Equinox was on the opposite side as the gas pump. Walker then got back into her car and waited for her gas to finish pumping.

After Walker returned to the Acura, it appears that the rear driver's side door of the Equinox opened briefly and then closed. Then, at approximately 1:30 PM, the Equinox reverses a short

23-11167                Opinion of the Court                7

distance. Immediately after reversing, White, who was driving, exited the vehicle. White walked over to a trash receptacle located between the Equinox and the Acura, leaned over, and then reentered the Equinox, without ever pumping gas.

The Equinox repositioned itself again, pulling forward only a few feet and then reversing. The Equinox reversed just enough to allow a direct path from the Equinox's backseat door to the Acura's driver's door.

At 1:32 PM, once Walker's gas finished pumping, Walker got out of her Acura to complete her transaction. Walker left her driver's side door open and her keys in the ignition. While she was finalizing her transaction, Toran jumped out of the backseat of the Equinox and into the driver's seat of Walker's Acura. Walker jumped on top of him and attempted to grab the keys out of the ignition. After a very brief struggle over the keys, Toran pulled a gun, put it to Walker's stomach, and told her to get out of the car. Walker told him that she would not leave without her children. Once her children were out of the car, Toran drove off in the Acura.

As soon as Toran got into the driver's seat of the Acura, White, in the Equinox, pulled out towards the gas station's exit. The Equinox did not immediately turn out from the gas station. At 1:33 PM, once Toran in the Acura pulled away from the pump, the Equinox made a right-hand turn out of the gas station with the Acura following immediately behind. Notably, the Acura drove past a closer, alternative exit to follow the Equinox.

Immediately following the carjacking, at 1:34 PM, Toran called White. White answered and the conversation lasted 17 seconds.[2] Toran and White then rendezvoused at an ADESA car auction parking lot.

## F.    The Rendezvous at ADESA from Video Surveillance

At 1:35 PM, Toran and White pulled into an ADESA car auction parking lot. Toran, driving the white Acura, was in front with White, driving the Equinox, following closely behind. White got out of the Equinox, walked over to the Acura, opened the door, and leaned into the Acura. Approximately 20 seconds later, White got into the Acura and shut the door. At 1:36 PM, Toran and White in the Acura drove away, leaving the Equinox in the ADESA lot.

## G.    Car Chase and Arrest

Toran and White left the ADESA parking lot and started driving back home to Jackson, Mississippi. After about two and a half hours, around the Mississippi state line, the two switched places and White took over driving the stolen Acura.

After Toran and White crossed into Mississippi, Sergeant Pitts was alerted about a possible carjacking with the tag number and description that matched the Acura. He set up on the interstate

---

[2] When asked about this call at trial, White testified "I don't really remember a phone call." White also testified that he did not have any service at the Circle K but noticed that he had service in the ADESA parking lot. According to White, he did not have cell phone service until he was in the Acura with Toran.

and began observing traffic.  Once Sergeant Pitts observed a vehicle matching the description of the stolen Acura, he pulled out and got behind the vehicle and confirmed the tag number.  Instead of initiating a stop, Sergeant Pitts radioed for several marked units from the Forest Police Department to head towards the interstate.  With three additional sheriff's department vehicles behind him, Sergeant Pitts initiated a stop of the Acura.

White did not pull the Acura over once the police lights were initiated.  Instead, White immediately sped up.  At that point, Sergeant Pitts initiated pursuit of the Acura.  White, in the Acura, continued to flee, weaving in and out of traffic at a very high rate of speed, approximately 130-plus miles an hour at the fastest, for 25 to 30 miles.  There were numerous attempts to spike the vehicle, but they were not successful.[3]  Eventually White stopped after a PIT maneuver was performed.[4]

Once the Acura stopped, officers approached.  White was given orders to exit the vehicle, but did not comply.  Eventually, an officer was able to open the door and White exited the vehicle.  Another officer grabbed White by the shoulder and White "went

---

[3] Spike strips are a tool used by law enforcement.  The spike strips are thrown out in the middle of the road.  Once a vehicle drives over the strips, spikes are inserted into the tires and the tires will deflate slowly.  They are used to slow the vehicle down.

[4] A PIT maneuver is a technique used by law enforcement when a vehicle is fleeing.  The police vehicle bumps the rear of the fleeing vehicle and makes the fleeing vehicle spin and go off the road one way or the other.

on the ground onto his belly." While on his stomach, White began pushing his hands under the Acura in a swimming motion. In response, Dedmon deployed his Taser, shooting White in the back. White then took his hands out from under the Acura and was placed in hand constraints.

In White's pockets, officers found an Alabama driver's license of a white female, along with other cards. A gun was found on the ground under the frame of the Acura on the driver's side. That gun was purchased by White. Officers did not find a gun on Toran, nor any other firearms inside the Acura. Toran and White were arrested.

## H.    Motion for Judgment of Acquittal

At the conclusion of the government's case, White moved for a judgment of acquittal on both counts. White argued that the government failed to present sufficient evidence that White intended to rob or carjack the Acura from Walker. The district court denied White's motion.

Then, White testified in his own defense. White testified that Toran told him that "he had found a ride for us to go to Atlanta and that they would let us borrow the car for the day or however long we were planning on staying gone." White also testified that: (1) he had his firearm with him on the trip to Atlanta; (2) he has "always known [Toran] to have a gun"; (3) he did not know Toran was going to steal the Acura; and (4) he had no intent, knowledge, or plan to aid and abet Toran in carjacking a car.

White testified that he only learned the Equinox was stolen during his conversation with Toran in the ADESA lot. According to White, Toran told him that he "was either going to be a sitting duck there having to answer for the car that [Toran] just stole and the Equinox or either [he] could at least try to make it home. And, you know, [they] wouldn't have to worry about that again. You know, [Toran] would take the blame for it himself."

White also testified that he was "just sitting at the pump, . . . trying to connect to some WiFi," when Toran opened the door and got out of the truck. White testified that shortly thereafter: (1) he heard screams and "pulled off"; (2) he "didn't really know what was going on"; (3) Toran "didn't explain to [him] what was about to go down, what [Toran] was about to do"; (4) he was "kind of frightened"; and (5) during the carjacking, his gun was in his possession—"maybe in [his] lap or in [his] hoodie pocket."

After the carjacking, White fled from the police because he was spooked and realized at that point how serious the situation was. White stated "[i]t was a little bit of being scared. At the same time, I guess, trying to help out a friend, realizing how much trouble he was in." White claimed that once the police activated their lights, Toran threw his gun out of the window. The officers involved in the Acura pursuit testified that they never saw a gun be thrown out of the vehicle. White also testified that he did not know "anything about a pistol being brought up or anything of that nature."

At the conclusion of White's testimony, the defense rested. The district court noted that White's motion for judgment of acquittal was preserved as to both counts. After deliberating, the jury found White guilty as to both counts.

The district court sentenced White to a term of 60 months' imprisonment on his Count One conviction for aiding and abetting a carjacking and a consecutive 84 months on his Count Two conviction for aiding and abetting the brandishing of a firearm in furtherance of a crime of violence, followed by 36 months of supervised release for each count to be served concurrently.

## II.    STANDARD OF REVIEW

We generally review challenges to the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the government. *United States v. Godwin*, 765 F.3d 1306, 1319 (11th Cir. 2014); *see also United States v. House*, 684 F.3d 1173, 1196 (11th Cir. 2012). Whether the evidence is direct or only circumstantial, we will accept all reasonable inferences and credibility choices that support the jury's verdict. *House*, 684 F.3d at 1196; *United States v. Williams*, 390 F.3d 1319, 1323-24 (11th Cir. 2004). We will not overturn a guilty verdict unless, based on the record evidence, no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Silvestri*, 409 F.3d 1311, 1327 (11th Cir. 2005).

## III.    DISCUSSION

The federal aiding-and-abetting statute provides that a person who aids or abets the commission of an offense is liable as

a principal. 18 U.S.C. § 2. For an aiding-and-abetting crime, the government must prove that the defendant "associated himself" with the underlying crime, "wished to bring it about," and otherwise sought to make the crime succeed by his actions. *United States v. Sosa*, 777 F.3d 1279, 1292 (11th Cir. 2015). To convict under an aiding-and-abetting theory, the government must prove three elements: "(1) someone committed the substantive offense; (2) the defendant contributed to and furthered the offense; and (3) the defendant intended to aid in its commission." *Id.* A defendant can be convicted of aiding and abetting even if he "has not personally committed all the acts constituting the elements of the substantive crime." *Id.* at 1293 (quotation marks omitted). The defendant must take an affirmative act in furtherance of the crime with the intent to facilitate its commission. *Id.* at 1292.

## A.    The Substantive Offenses

To convict a defendant of carjacking under 18 U.S.C. § 2119, the government must prove that the defendant "(1) with intent to cause death or serious bodily harm (2) took a motor vehicle (3) that had been transported, shipped or received in interstate or foreign commerce (4) from the person or presence of another (5) by force and violence or intimidation." *United States v. Diaz*, 248 F.3d 1065, 1096 (11th Cir. 2001); *see* 18 U.S.C. § 2119. To convict a defendant of brandishing a firearm under 18 U.S.C. § 924(c), the government must prove that the defendant (1) knowingly (2) brandished a firearm (3) during and in relation to a crime of violence. *See United States v. Isnadin*, 742 F.3d 1278, 1307 (11th Cir. 2014).

As an initial matter, White does not dispute that the elements of the underlying offenses of carjacking and brandishing a firearm in furtherance of a crime of violence were met. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir.) (en banc), *cert denied*, 143 S. Ct. 95 (2022). White also does not argue that his actions did not contribute to or further the offenses. Instead, White's appeal challenges the sufficiency of the evidence regarding his intent under the federal aiding-and-abetting statute.

## B.    Intent

To satisfy the intent required for aiding and abetting, a defendant must, independent of the affirmative act requirement, actively participate in the commission of the crime, "with full knowledge of the circumstances" that constitute the whole offense. *Rosemond v. United States*, 572 U.S. 65, 77 (2014). A person is "responsible for a crime he has not personally carried out if he helps another to complete its commission." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 488 (2023) (quoting *Rosemond*, 572 U.S. at 70).

Where the defendant is charged with aiding and abetting an 18 U.S.C. § 924(c) firearm offense, full knowledge will constitute "advance knowledge" that the firearm will be brought to carry out the crime. *Rosemond*, 572 U.S. at 78. Having advance knowledge allows the defendant to make a choice to continue to participate in the commission of the crime or withdraw. *Id.* Thus, if a defendant has continued with the commission of a crime even after a gun has been drawn or used, a jury may reasonably infer that he had such

advance knowledge from his failure to object or withdraw. *Id.* at 78 n.9.

Here, there was more than ample evidence to convict White of both crimes because the government presented a plethora of evidence from which a reasonable jury could have readily inferred White's willful participation in the carjacking and that White had advance knowledge that a gun would be used in the commission of the carjacking. For instance, the evidence showed: (1) White always knew Toran to have a gun on him; and (2) White drove the stolen Equinox from which Toran emerged with a gun. The video surveillance footage even suggests that Toran and White were scouting for a victim. Then, after the carjacking and brandishing of a firearm, White continued participating in the crime and attempted to flee the police in the stolen Acura. Further, the only gun recovered was White's gun.

White stresses his own trial testimony in support of his arguments on appeal. But "when a defendant takes the stand in a criminal case and exposes his demeanor to the jury, the jury may make adverse determinations about his credibility and reject his explanation as a complete fabrication." *United States v. Vazquez*, 53 F.3d 1216, 1225 (11th Cir. 1995). The testifying defendant "runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true." *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) (quotation marks omitted). If the jury disbelieves the defendant on a point, the jury may consider that testimony "*substantive evidence* of the defendant's guilt," and that testimony

"may establish, by itself, elements of the offense." *Id.* at 314-15. "This rule applies with special force where the elements to be proved for a conviction include highly subjective elements: for example, the defendant's intent or knowledge." *Id.* at 315.

Here, the jury was free to discredit White's testimony and consider it as substantive evidence of his guilt. *See Vazquez*, 53 F.3d at 1225; *Brown*, 53 F.3d at 314-15. And, based on the government's substantial evidence implicating White, we cannot disturb the jury's credibility determinations on appeal. *See United States v. Feliciano*, 761 F.3d 1202, 1206 (11th Cir. 2014).

## IV.    CONCLUSION

For the reasons stated above, we affirm White's two convictions.[5]

**AFFIRMED.**

---

[5] On appeal, White does not raise any issue as to his sentence.